## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TJGEM LLC, | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) **CASE NUMBER 1:13-CV-00382-BAH** |
| | ) |
| REPUBLIC OF GHANA, et al., | ) |
| | ) |
| **Defendants.** | ) |

### DECLARATION OF PROFESSOR KOFI QUASHIGAH

I, Kofi Quashigah, declare that if called as a witness in this action, I could and would competently testify to the following, based on personal knowledge or information, and as my expert opinion.

1.     I am a citizen and resident of the Republic of Ghana.  I am an attorney at law duly admitted in the Republic of Ghana since 1981.  I am the Dean of the Law Faculty of the University of Ghana, and have held that position since January, 2009.  Attached as Exhibit 1 hereto is a true and correct copy of my C.V.

### Constitutional Structure of the Republic of Ghana

2.     The Republic of Ghana is a sovereign state.  The Constitution of the Republic of Ghana was adopted in 1992.  The Constitution provides for three branches of government:  the Executive, Parliament and the Judiciary.  See Chapters Eight, Ten and Eleven respectively of the 1992 Ghanaian Constitution.  (Exhibits 2, 3 and 4 hereto).  The Ministry of Finance is an organ of the Republic of Ghana.  See Article 58(1),(3),(4) of the 1992 Ghanaian Constitution.  (Exhibit 5 hereto).

3.     Each of the branches of government is autonomous of the others.  See generally Chapters Eight, Ten and Eleven respectively of the 1992 Constitution and particularly Article

58(1),(2),(3),(4) [in respect of the Executive] (Exhibit 5 hereto), Article 93[in respect of the

Legislature] (Exhibit 6 hereto), Article 125(1),(3) (Exhibit 7 hereto), Article 127 [in respect of

the Judiciary] (Exhibit 8 hereto). The judiciary in Ghana is, therefore, independent of the

Executive and Parliament, and these latter braches respect the Constitutional autonomy of the

judiciary. Judges are appointed and serve until reaching the retiring age but may be removed

from office for "stated misbehavior or incompetence or on ground of inability to perform the

functions of office arising from infirmity of body or mind." Any purported removal must be in

accordance with the strict procedure prescribed in the Constitution. See Article 146 of the 1992

Ghanaian Constitution] (Exhibit 9 hereto).

    4.    The government of Ghana, including its organs, agencies and instrumentalities,

may be sued in the courts of Ghana. See *C.C.W Ltd v. Accra Metropolitan Assembly* No.

J4/5/2007 13TH February 2008. The Government of Ghana is subject to claims against it as if it

were an ordinary citizen. Article 293(1) of the 1992 Ghanaian Constitution (Exhibit 10 hereto)

provides that: "Where a person has a claim against the Government, that claim may be enforced

as of right by proceedings taken against the Government for that purpose without the grant of a

fiat or the use of the process known as petition of rights." The courts of Ghana do not favor

governmental parties over private litigants. Foreign litigants also enjoy equal treatment under

the law, and have equal access to the courts. See Article 127(2) of the 1992 Ghanaian

Constitution, *supra*; *Attorney General v. Balkan Energy Ltd.*, decision of Ghana Supreme Court

No. J6/1/2012 16 May 2012.

    5.    In sum, the courts of Ghana afford all parties due process of law.

Complaint of TJGEM, LLC

    6.    I have reviewed the Complaint filed by TJGEM, LLC ("TJGEM") in this action.

7.    In my opinion, under a conflicts of law analysis, the circumstances, dealings and any resulting contract relating to the allegations in the TJGEM Complaint are governed by Ghanaian law, and not by United States law.  This matter relates to a project that was to be executed in Ghana, the defendants are in Ghana and there is no agreement that could be interpreted as agreeing that any dispute arising should be heard only in the Courts of the United States of America.  See *The Assunzione* [1954] 1 All E.R 278.

8.    TJGEM could file a similar complaint in the courts of Ghana against these same defendants.  In my opinion, the courts of Ghana have personal jurisdiction over all of the named defendants in this action.  The governmental defendants (including the Republic of Ghana, the Accra Metropolitan Assembly ("AMA"), former Minister Kwabena Dufour, and Mayor Alfred O. Vanderpuije) are subject to the jurisdiction of the Ghana courts because they are Ghanaian entities or citizens.  The Conti Construction Co., Inc. defendant also would be subject to the jurisdiction of the Ghanaian courts because it is alleged to have conducted business in Ghana.

9.    Ghanaian law provides for causes of action similar to the ones asserted in the TJGEM Complaint, and damages also may be pleaded.  I am not declaring herein that TJGEM would or would not prevail on these claims in Ghana.  Rather, that the types of legal theories asserted are generally available also in Ghana.  As indicated above, if TJGEM pursued its claims in the courts of Ghana, it would be provided the same due process as any Ghanaian entity.

10.    The Ghanaian legal system also provides for appellate review, and TJGEM also would have recourse to appellate review.  See Chapter Eleven of the 1992 Ghanaian Constitution, *supra*.  Again, I am not declaring whether TJGEM would prevail or not on appeal, but explaining that the process of appellate review also is available.

/ / /

-3-

Accra Metropolitan Assembly

  11.  Accra is the capital of the Republic of Ghana.  Accra is governed by a mayoral council system of government in which the mayor, or Metropolitan Chief Executive, is the highest ranking public official - the Mayor is the chief representative of the Government in the district.  See Section 20(3)(d) Local Government Act, 1993 (Exhibit 11 hereto).  The Metropolitan Chief Executive is appointed by the President of the Republic of Ghana, and approved by the AMA.  The Mayor of Accra, like all other District Chief Executives are appointed by the President with the prior approval of the District Assembly.  See Article 243 of the 1992 Ghanaian Constitution (Exhibit 12 hereto) and Section 20 of the Local Government Act, 1993 (Exhibit 11 hereto).

  12.  AMA is an organ of the Republic of Ghana, established by the Ghanaian Constitution.  See Chapter Twenty of the 1992 Ghanaian Constitution; particularly Article 240; also the Local Government Act (Exhibit 13 hereto).  The AMA has 104 assembly members, 70 percent of which are elected, and the remainder appointed by the President in consultation with the traditional authorities and other interest groups in the district.  See Article 242 of the 1992 Ghanaian Constitution (Exhibit 14 hereto).

  13.  The Powers of the AMA Metropolitan Chief Executive are set forth in Article 243(2) of the 1992 Ghanaian Constitution, *supra*, and Section 20(3) of the Local Government Act, 1993, Act 462, *supra*, and generally include (a). presiding at meetings of the Executive Committee of the Assembly (b). having responsibility for the day –to- day performance of the executive and administrative functions of the District Assembly; and (c). being the chief representative of the Central Government in the district.

  / / /

-4-

<u>Accra Mayor Lacks Actual Authority To Award the Subject Contract</u>

14.    I also have reviewed the Declarations of the Coordinating Director of AMA, and of the Chief Director of the Ministry of Finance of the Republic of Ghana, being submitted to the Court herewith.  I agree with the declarants that Mr. Vanderpuije, in his capacity as Metropolitan Chief Executive of AMA, lacked actual authority to award the contract for the subject infrastructure project to TJGEM, for the various reasons discussed below under Ghanaian law.

15.    The issue, whether the Metropolitan Chief Executive of AMA had actual authority to award the contract for the subject infrastructure project, is governed by Ghanaian law, because Ghanaian law sets forth the authority of the Metropolitan Chief Executive of AMA. See the 1992 Ghanaian Constitution, the Local Government Act, 1993, Act 462 and the Public Procurement Act, 2003, Act 663, *supra.*

16.    Further, under Ghanaian law, persons and entities (like TJGEM) dealing with governmental officials are presumed to know Ghanaian law related to the actual authority of governmental officials with whom they have dealings.   Under Ghanaian law every person is deemed to know the law or at least to conduct due diligence with the assistance of competent counsel.  If the plaintiffs had done due diligence they would have informed themselves of the requirements of the Constitution, Procurement Act and the Local Government Act as they relate to the handling of contracts relating to the subject matter of this dispute.  The public policy behind these principles, which are recognized in most established legal systems in the World, is to ensure that the Rule of Law and approved processes are followed and complied with to eliminate the incidence of corruption and to encourage or promote transparency in the award of contracts which is a virtue espoused by well-meaning establishments.

    / / /

### The Required Process And Approvals To Award the Subject Contract

17.    Under Ghanaian law, the process for the awarding of the subject contract is as follows, and would require the following approvals set out in law, namely, in the 1992 Ghanaian Constitution, the Procurement Act, the Local Government Act, and the Environmental Protection Agency Act, 1994, Act 490 and its Regulations.

18.    Under Ghanaian law all procurements of goods, works and services are subject to the Provisions of the Public Procurement Act, 2003, Act 663.  This legislation was promulgated principally to provide for administrative and institutional arrangements for procurements by all public institutions, including AMA.  It is directed principally at eliminating corruption and ensuring that public contracts are awarded to the best bidder to guarantee transparency and value for money.  Breach of its set procedures is subject to punitive criminal action.  See Part IX of Act 663 relating to Offences relating to procurement (Exhibit 15 hereto).  Part V of Act 663 (Exhibit 16 hereto) sets out in elaborate detail the Tendering Procedures – there are procedures for inviting tenders, prequalification, standard of tender documents, submission of tenders, period of validity of tenders, opening of tenders, examination of tenders, evaluation of tenders, etc.  It is also required that a tenders board be properly constituted and follow the procedure as laid down by law.  In Schedule 1 of Act 663 (Exhibit 17 hereto) said Metropolitan/Municipal/District Tender Committee is composed of the following persons:  The Metropolitan, Municipal or District Chief Executive as Chairperson, with the following as members – the Director of Finance, a Lawyer appointed by the Assembly, one Member of Parliament and three heads of Departments one of whom represents the user department or agency.  The quorum shall be four members including the chairperson.  Obviously, based on the foregoing, the Chairperson (in this case the Metropolitan Chief Executive or Mayor), alone, lacks authority to and cannot make a

decision on behalf of the procurement board. This procurement board procedure also requires participation and/or approvals by various other entities, including the Ghanaian Public Procurement Authority, the Ghanaian Parliament, the Ghanaian Ministry of Water Resources, Works and Housing, the Ghanaian Ministry for Local Government and Rural Development, the Ghanaian Ministry of Finance, and the Office of the President of Ghana.

19.    Where the amount of money involved is beyond the established thresh-hold of a tender entity its decision is subject to the approval by a superior Board. Because the subject contract is for allegedly over $500 million, it would require such approval, as well. Furthermore, the Public Procurement Act, 2003 establishes procedures for the "procurement of goods and services, financed in whole or in part from public funds..." See Public Procurement Act, 1993, Act 663, section 14(1)(a) (Exhibit 18 hereto). In addition, according to article 181(3) of the 1992 Ghanaian Constitution, "[n]o loan shall be raised by the Government on behalf of itself or any other public institution or authority otherwise than by or under the authority of an Act of Parliament." (Exhibit 19 hereto). Therefore, Parliament also must approve loans for public institutions and, thus, by implication the very projects for which the loan is sought.

20.    Finally, approval for the project must also be obtained from the Environmental Protection Agency Act, if required, before any project agreement is finalized.

21.    All of the above measures are intended for avoidance of corruption, to ensure transparency, and to encourage competitiveness. Until and only if all such approvals are obtained, AMA cannot contract for the subject project. Any representation by any governmental official to the contrary, including any such alleged representation by the Mayor (again, not declaring that any representation was ever made), has no legal significance whatsoever and cannot bind AMA and/or the Republic of Ghana under Ghanaian law.

22.    If after the subject contract is awarded TJGEM wishes to challenge the procurement process or ultimate award, procedures are available in Ghana under the Public Procurement Act, 2003, Act 663 – see generally Part VII of the Act (Exhibit 20 hereto).  Again without declaring that there is any basis to TJGEM's allegations, TJGEM also has procedures available to report to the Ghanaian authorities any alleged improprieties in the course of the procurement process or ultimate award.  TJGEM could lodge a complaint with the Economic and Organized Crimes Office, Act 804 or with the Commission in Human Rights and Administrative Justice.  See e.g. the Ghana Supreme Court case of *CHRAJ v. A.G and Baba Kamara* [2011] 2 SCGLR 746.

## Foreign Sovereign Immunity And Related Principles

23.    In my opinion, under established principles of international law, AMA and the Republic of Ghana have sovereign immunity from the jurisdiction of the United States courts with respect to this dispute.  Ghana is a Sovereign Republic.  See Articles 1(1) and 4(1) of the Ghanaian Constitution (Exhibits 21 and 22 hereto).  However, as noted above, AMA, the Republic of Ghana may be sued in the courts of Ghana.  Further, under Ghanaian law and international law, the Mayor and former Minister of Finance have governmental official immunity from the jurisdiction of the United States courts with respect to this dispute.  However, if TJGEM is able to establish official wrongdoing by these persons, then TJGEM also would be able to assert claims against them in the courts of Ghana.  I am not declaring regarding the probability of success of any such claims.

24.    Ghanaian law also respects principles of international comity.  It is my opinion that under principles of reciprocity, even if the United States District Court had jurisdiction over this matter and these defendants, the action should be dismissed based on abstention grounds.

25.    Accordingly, I respectfully submit to the United States District Court that, in my opinion, this action should be dismissed in the United States, and TJGEM should be required to proceed in the Ghanaian judicial forum should it choose to do so.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Accra, Ghana.

Dated:  7th June 2013.

Kofi Quashigah

# CURRRICULUM VITAE
## OF
## PROFESSOR KOFI QUASHIGAH

**SUMMARY**

Prof. Kofi Quashigah is an Associate Professor at the Faculty of Law, University of Ghana and Dean of the Faculty. His teaching and research interests include Constitutional Law, Human Rights, International Humanitarian Law, Jurisprudence, Governance, Elections Law and Alternative Dispute Resolution.

He was a Fulbright Scholar at the Harvard Human Rights Program between 2001/2002 and a McArthur Foundation Visiting Scholar at the University of Wisconsin, USA in 1992.

He was adjudged and honoured as the 2005 Best Teacher in the Humanities in the University of Ghana.

Prof. Quashigah was the brain behind the design and implementation of the newly introduced LL.M in International Law & International Humanitarian Law Programme of the Faculty. He was equally instrumental in negotiating the inclusion of the Faculty in the LL.M in Human Rights and Democratization in Africa; a programme in which five other Universities are partners.

In collaboration with Prof. Obiora Okafor of the Osggode Hall, Law School, Canada, he promoted and edited the classical book titled "Legitimate Governance in Africa," published by Kluwer Publishers in 1999.

He is currently spearheading the production of the first issue of the "Annual Survey of Ghana Law." This is a project that is intended to revolutionize the approach to legal research in Ghana.

He has on several occasions selected, trained and led the University of Ghana team to several of the Annual All Africa Human Rights Moot Court Competition. Several honours were won thus creating a special niche for the Faculty of Law of the University of Ghana among Faculties of Law in Africa.

Prof. Quashigah is the Director of the Human Rights Centre of the Faculty of Law, University of Ghana. He had undertaken a number of Consultancies for UNICEF and others; these include, UNICEF/Ministry of Education, consultancy work on the Legal Framework For The Right To Pre-Tertiary Education In Ghana – 2001; for UNICEF – Ghana, - he undertook a study on "Legislative Reform Initiatives, Institutional Development and Policy Changes in Favour of Children: Ghana National Study." – June/July 2004; Consultant to National Governance Programme (under the UNDP Consolidating Democratic Governance Programme) – he was contracted to write a comprehensive but concise assessment of the Human Rights environment to be integrated into the Governance Component of the Country Assessment on Ghana – June 2004;

# EXHIBIT 1

Research into HIV in Ghana for Centre for Human Rights, University of Pretoria, South Africa – 2005; Consultant assisting Ministry of Education in the Drafting of a Bill for a new Education Law for Ghana – 2005.

He has attended several ADR training sessions in Ghana and also visited the Harvard Negotiation Program and the Harvard Mediation Program. He has been involved in the teaching of ADR to various groups in Ghana. He had co-ordinated the World Bank Institute Distance Learning Training in ADR - 2005.

He had participated in a training session on Conflict Resolution at the Fifth Annual International Seminar on Arms Control & Disarmament – 10th - 23rd September, 1997 at the Baker Institute, Juniata College, Williamsburg, Pennsylvania, USA.

Prof. Quashigah was the Associate Dean (Vice Dean) of the Faculty of Law of the University of Nigeria between 1991 and 1993.

He had undergone extensive training in Alternative Dispute Resolution Skills and also Labour Management techniques. These are skills required for effective leadership. Prof. Quashigah is a qualified Mediator and teaches and practices mediation.

Between January/February 2005 he was the Ghana country Facilitator for a World Bank Institute Distance Learning Course on Alternative Dispute Resolution for Ghana and Nigeria. He also was the Facilitator for the Workshop on the Alternative Dispute Resolution Bill of Ghana held on 2nd and 3rd September 2005. Again from 22nd – 25th November 2005 he was the Ghana Facilitator of the International Development Law Organization (IDLO) Distance Learning Course on Strategic Litigation/Public Interest Litigation.

He is the incumbent President of the Ghana Association of Certified Mediators and Arbitrators.

He is also the Co-ordinator of the ADR Coalition of Ghana. The Coalition is made up of institutional representation from the Judiciary, the Ghana Bar Association, the Faculty of Law of the University of Ghana, the Ghana Arbitration Centre and the Ghana Association of Certified Mediators and Arbitrators.

He is into citrus farming on part-time basis and even then was able to manage the farm to be adjudged the best citrus farmer in Akwapim North District for 2006.

He was instrumental in the Faculty of Law winning Four TALIF awards for projects within the Faculty.

He had assisted the ADR Coalition – Ghana in securing funding from the UNDP. The UNDP was able to support the production of a Handbook on ADR in Ghana through the Coalition.

2

He was very instrumental in the raising of funds for the organization of the 2000 All Africa Human Rights Moot Court Competition hosted by the Faculty of Law of the University of Ghana.

# COMPLETE CURRICULUM VITAE

A. **Full Name: KOFI QUASHIGAH**

B. **Title:  Associate Professor & Dean, Faculty of Law, University of Ghana**

C. **Occupation: Lecturer in Law, Faculty of Law, University of Ghana**

D. **Contact Address & Phone Numbers:**
   **Faculty of Law**
   **University of Ghana**
   **Legon**
   **Accra**
**Phone: 233 20 8181454 (Cell)**

**E-mail: kquashigah@ug.edu.gh & kquashigah2001@yahoo.com**

E. **Educational Background**

(a).   **Institutions Attended with Dates:**

   (i)      University of Ghana, Legon -  September 1976 -August 1979.
   (ii)     Ghana Law School - Accra.  September 1979 - June 1981.
   (iii)    University of Nigeria, Enugu Campus - October 1983-November 1984.
   (iv)    University of Nigeria, Enugu Campus - October 1985-December 1989.

(b).   **Academic Qualifications with Dates:**

   (i)      LL.B. (Ghana), October 1979.
   (ii)     Barrister-at-Law, Ghana, November 1981.
   (iii)    LL.M. (NIG).  November 1984.
   (iv)    Ph.D. (NIG).  December 1989.

F. **Working Experience:**

   (i)      Ministry of Justice, Ghana -  As State Counsel - September 1981 - August 1982.
   (ii)     Research Counsel.  Nigeria Law Publications, October 1982 - September 1983.
   (iii)    Lecturer in Law, University of Nigeria.  September 1985 - August 1994.
   (iv)    Lecturer in Law, University of Ghana, September 1994 – April 1996.
   (v)     Senior Lecturer – April 1996 – May 2000
   (vi)    Associate Professor – May 2000 – To Date

G. **Areas of Teaching & Research Interest:**

(i)     Human Rights
(ii)    Jurisprudence
(iii)   Constitutional Law
(iv)    International Humanitarian Law
(v)     Governance & Conflict Resolution.
(vi)    Alternative Dispute Resolution

**H. Details of Teaching Experience At University Level:**

( i )   University of Nigeria, 1985 - 1994 Undergraduate Courses Handled
        (a)     Constitutional Law
        (b)     Jurisprudence
        (c)     The Law of Contract and Tort (A Service Course for the Faculty
             of Environmental Studies)
        (d)     Law of Evidence (Tutorial)

Post-Graduate Course Handled:
Human Rights.

( ii )  University of Ghana, 1994 To Date
      Course Assigned:
        (a)     Constitutional Law
        (b)     Jurisprudence
        (c)     Human Rights
        (d)      International Humanitarian Law

(iii)   Guest Lecturer in Basic Law, Ghana Institute of Public Administration (GIMPA).

(iv)    Visiting Lecturer in LLM Human Rights at the University of Pretoria, South Africa – March, 2000, April 2004, May 2005.

(v)     Visiting Professor, University of Education, Winneba – 2005.

(vi)    Member Accreditation Panel to Review proposed and existing law programmes in some tertiary institutions in Ghana – 2006 & 2007.

**I.    Fellowships:**

(i)     Fulbright Scholar at Harvard University Human Rights Program – 2001-2002.
(ii)    Social Science Research Council McArthur Foundation.  Visiting Scholar 1991 (University of Wisconsin, Madison).
(iii)   Social Science Research Council Small Grants Workshop Fellowship 1993 - For use in hosting a Workshop on THE ROLE OF HUMAN

RIGHTS NG0s IN THE PROMOTION AND PROTECTION OF
HUMAN RIGHTS IN WEST AFRICA.

**J.    Administrative Positions Held:**

(i)     Associate Dean of Law (Vice Dean), University of Nigeria, 1991-1993.

(ii)    Faculty Representative, Board of School of Postgraduate Studies,
University of Nigeria, 1988-1994.

(iii)   Faculty Representative,  Board of General Studies,  University of
Nigeria, 1988-1994.

(iv)    Hall Warden,  Mariere Hall,  University of Nigeria, Enugu Campus,
1991-1994.

(v)     Director, Human Rights Study Centre, Faculty of Law, University of
Ghana

(vi)    Member, Publications Board, University of Ghana

(vii)   Member, Human Rights Committee of the Ghana Bar Association –
1998 & 1999

(viii)  Hall Tutor – Commonwealth Hall, University of Ghana, Legon – Current.

(ix)    Council of Commonwealth Hall – Member – Current.

(x)     Faculty Representative – Board of Graduate Studies, University of Ghana
– 1999 - Date

(xi)    Chairman, Disciplinary Board for Junior Senior Staff – 2004-2006

(xii)   Chairman, Disciplinary Board for Senior Members – 2006 - 2008

(xiii)  Chairman, Examination Malpractices Committee – From time to time

(xiv)   Member, Teaching and Learning Innovation Fund (TALIF) Proposal
Review Committee – 2004 to Date

(xv)    Member, University Tenders Board, University of Ghana - Current

(xvi)   Member, Procurement Committee, University of Ghana - Current

(xvii)  Co-opted Member – Project for the Ascertainment of Customary Law in
Ghana - 2007

(xviii) Member, University Negotiating Team for the Settlement of Labour
Dispute with laid off Casuals of the University - 2007

**K.**     **Consultancy:**

1. Consultant for Royal Danish Embassy, Ghana and the Commission on Human
Rights and Administrative Justice, Ghana on Project for the Identification of
Areas for Possible Danish Support to Ghana's Commission on Human Rights and
Administrative Justice.

2. Guest Lecturer – Ghana Institute of Public Administration (GIMPA) – 1998 To
Date.

3. Guest Lecturer – African Human Rights Camp 1997, 19th October – 7th
November 1997 at Sogakope ,Ghana.

4.   Consultant to the Directorate for Social Mobilization – (Nigeria, Anambra
State) for the teaching of the Constitution and the production of Handbook on
Understanding the Constitution of Nigeria – period 1989 to 1990.

5. Guest Lecturer to Newly Elected Members of the Anambra State House of
Assembly under the short-lived 1989 Constitution of Nigeria – Organizational
Structure and Function of State Legislatures Under the 1989 Constitution.

6. Consultant on Alternative Dispute Resolution on World Bank Project into
Alternative Dispute Resolution in Ghana – 1999.

7. Consultant – UNICEF/Ministry of Education for consultancy work on the
LEGAL FRAMEWORK FOR THE RIGHT TO PRE-TERTIARY EDUCATION
IN GHANA.

8. Consultant – Centre for Democracy & Development.

**L.**     **CONFERENCES, SPECIAL SEMINARS AND WORKSHOPS AT WHICH
PAPERS WERE READ:**

1. 1992 Conference of the African Studies Association held at Seattle, Washington.
U.S.A., 20 - 24 November. 1992.
                    **Title of Paper Presented**
Protection of Human Rights in the Changing Domestic and International Scenes:
Prospects in Sub-Saharan Africa (Hosted by the S.S.R.C at Seattle).

7

2. International Conference on West African Integration organized by the International Development Research Centre (IDRC) at Dakar. Senegal. 11 - 15 January. 1993.
**Title of Paper Presented:**
Human Rights and Integration in West Africa.

3. Joint Konrad Adenauer Foundation/Catholic Institute for Development, Justice and Peace (CIDJAP) International Colloquium on Regionalism, Ethnic and Tribal Conflicts and Democracy in Africa held at Enugu, Nigeria, from 6th - 18th June, 1993.
**Title of Paper Presented:**
National Integration and Local Conflicts.

4. Sixth Annual Conference of the African Society of International and Comparative Law held in Accra, Ghana, 20th - 24th September, 1993.
**Title of Paper Presented:**
The United Nations and Humanitarian Intervention in the Contemporary World Situation, Published in Proceedings of the Sixth Annual Conference of the African Society of International and Comparative Law, Accra. 20 - 24 September, 1993. pp. 36-63.

5. Human Rights Seminar for Public Law Teachers. Gateway Hotel Ota, Nigeria, Sponsored by Friedrich Nauman Foundation, November 27 - 30,       1994.
**Title of Paper Presented:**
Why Human Rights? The Relevance of Human Rights in Contemporary International Politics and Relations.

6. Social Science Research Council (USA) Workshop on the Role of Human Rights Non-Governmental Organizations held at the Zodiac Hotel, Enugu, Nigeria, 17th - 19th May 1995.
**Title of Paper Presented:**
The Role of Human Rights Non Governmental Organizations (NG0s) within the Legal and International Framework of the African Charter on Human and Peoples' Rights (ACHPR).

7. Eighth Annual Conference of the African Society of International And Comparative Law, Cairo, Egypt, 2 - 5 September, 1996.
**Title of Paper Presented:**
Human Rights And African Economic Integration.

8. Seminar on "The Judicial System and the Protection of Human Rights in Ghana," organized by the Konrad Adenauer Foundation of Germany and the Human Rights Study Centre Faculty of Law, Legon at Golden Tulip Hotel.       Accra, Ghana, 18th - 19th September, 1996.
**Title of Paper Presented:**
The Judicial System and the Protection of Economic Rights in Ghana.

9. Seminar on "Ghana's Judicial System and Access to Justice - A Tool for the Protection of Human Rights," organized by the Konrad Adenauer Foundation of Germany and the Human Rights Study Centre, Faculty of Law, Legon, at Golden Tulip Hotel. Accra. Ghana. 13th December 1996.
**Title of Paper Presented with Ms. Monica Blackie:**
Legal Measures and Policies in Ghana for Poverty Reduction.

10. Fifth Annual International Seminar on Arms Control & Disarmament- 10th - 23rd September, 1997, Baker Institute at Juniata College, Juniata Conference Centre, Williamsburg, Pensylvania, USA.
**Title of Paper Presented:**
Confidence Building as a Process of Peaceful Settlement of the Armed Conflict in Northern Ghana.

11. Commonwealth Convention on Advancing Economic, Social And Cultural Rights, 7th - 10th December, 1998.
**Title of Paper Presented:**
The International Covenant on Economic, Social and Cultural Rights and the Committee on Economic and Social Rights: Implementation by Governments.

12. Tenth Annual Conference of the African Society of International and Comparative Law- Addis Ababa 2-5th August 1998.
**Title of Paper Presented:**
The African Court of Human Rights: Prospects In Comparison with the European Court of Human Rights and the Inter American Court of Human Rights.

13. Conference of the International Academy for Freedom of Religion and Belief- Brigham Young University of America, Catholic University of America, 3-9th October 1998.
**Title of Paper Presented:**
Legislating Religious Liberty: The Ghanaian Experience.

14. Eleventh Annual Conference of the African Society of International & Comparative Law – Harare, Zimbabwe, July, 1999.
**Title of Paper Presented:**
National Human Rights Institutions in Africa: Functions, Strengths and Weaknesses.

15. Workshop on the National Identification Bill – CDD, Accra – 8th September 2004
**Title of Paper Presented:**
The Independence of the National Identification Authority.

16. Workshop on Electoral Adjudication – Ho, 3rd – 5th October 2004
**Title of Paper Presented:**
Ghana's Electoral Laws in Perspective.

9

17. Workshop on Judicial Reform Programme Focussing on the use of Alternative Dispute Resolution to improve access to Justice – Accra, January 26, 2005
### Title of Paper Presented:
Ghana: Country experience with Alternative Dispute Resolution

18. Workshop for Commission on Human Rights and Administrative Justice – Accra, 22nd – 24th March 2006
### Title of Paper Presented:
Identifying Human Rights Issues

19. Workshop on Empowering the Serious Fraud Office – CDD, Accra, 23rd March 2005
### Title of Paper Presented:
Making the Serious Fraud Office more Effective, Responsible and Accountable.

20. OSIWA Regional Conference on Women and the Law in West Africa, Dakar, Senegal, 3rd- 5th July 2006.
### Title of Paper Presented:
The Role of Legal Education in Ensuring that the Law Enhances and protects the rights of Women.

21. ISS/PPS Symposium on Responsibility to Protect in Africa – Kofi Annan Peace Keeping Centre, Accra, 25th – 26th October 2006
### Title of Paper Presented:
The Responsibility to Protect in Africa - Discussant

22. Workshop on Court Connected Alternative Dispute Resolution, Accra, 14th – 15th September 2007
### Title of Paper Presented:
Court-Connected Alternative Dispute Resolution Methods.

23. Workshop on the Rights and Protection of the Child, Accra, 30th – 31st March 2006
### Title of Paper Presented:
Expose on the 1992 Constitution of Ghana.

24. ECOWAS Brainstorming Expert Planning Workshop on National Human Rights Institutions in West Africa, Accra, 5th -6th July 2006
### Title of Paper Presented:
Strengthening NHRIs in Europe: Lessons for Africa.- Discussant

25. 2ND Annual National Human Rights Lectures, Accra, October 31, 2006
### Title of Paper Presented:
Realizing Socio- Economic Rights Under the 1992 Constitution: Prospects and Challenges.

26. Seminar on Arbitration and Alternative Dispute Resolution in Ghana, Kumasi, 28th March 2006

**Title of Paper Presented:**

ADR and its Potentials in Ghana.

27. Workshop for Judges and Lawyers on Litigating Economic, Social and Cultural Rights in Ghana, Accra, 26th – 28th July 2006.

**Title of Paper Presented:**

The Justiciability of Economic Social and Cultural Rights as Human Rights: The Ghanaian Experience

28. Human Rights in Africa Conference – at the United Nations Conference Centre, Addis Ababa, Ethiopia, 1st September 2006

**Title of Paper Presented:**

The Peoples' Rights In The African Charter: Assessment Of Their Impact On Human Rights Jurisprudence.

29. 2nd West African Judicial Colloquium - Promoting Judicial Independence and Access to Global Jurisprudence, Accra 8-10 October 2007,Accra

**Title of Paper Presented:**

Promoting the Independence of National Courts through their Application of Other National and Internationally-Developed Legal Standards

30. The Ghana Association of Arts and Sciences/Fredrich Erbert Stiftung Public Forum on "Evolution of Constitutionalism in Independent Ghana", – June 18 – 2007

**Title of Paper Presented:**

Constitutionalism and the Westminster System in Ghana (1957 And 1969)

## M.  PUBLICATIONS

**(a) Articles:**

1. "Reflections on the Judicial Process in Traditional Africa" -  published in The Nigerian Juridical Review, Vol.4. (1989-90) pp. 1 - 15.

2.  "Constitutional Protection of Pre-Trial Release: The Onu Obekpa v. C.O.P. and C.O.P.v. Amalu Controversy" -  published in The Nigerian Juridical, Review vol. 4, (1989-90) pp.16-23.

3. "The Federal Principle in 1989 Constitution of Nigeria: Its securement with respect of Emergency Situations, Creation of States and Constitutional Amendment" -  published in Journal of Constitutional and Parliamentary Studies, Vol. XXIV Nos. 1-4 (Jan. - Dec. 1990), pp.28-52.

4. "The Philosophical Basis of Human Rights and its Relation to Africa: A Critique" - published in Journal of Human Rights & Practice, Vol. 2 Nos. 1 & 2, (1992) pp. 22-39.

5. "Highlights of the Comparative Features of the 1979 and 1989 Nigerian Constitutions" - published in The Nigerian Juridical Review, Vol. 5, (1991-1993) pp. 92-112.

6. Prof. G. Ezejiofor & E.K. Quashigah, "The United Nations and Humanitarian Intervention in the Contemporary World Situation" - published in The Proceedings of the Sixth Annual Conference of the African Society of International and Comparative Law, Accra, 20-24 September, 1993. pp. 36-63.

7. "Protection of Human Rights in the Changing International Scene: Prospects in Sub-Saharan Africa" - published in The African Journal of International and Comparative Law (RADIC) Vol. 6, Pt. 10 (1994) pp. 93-114.

8. "Legitimacy of Governments and the Resolution of Intra-national Conflicts in Africa" - - published in African Journal of International and Comparative Law (RADIC)Vol.7,Pt.2, (1995) pp. 284-304.

9. "Nemo Judex in Causa Sua and its Exception based on Necessity: The Position Under the 1979 and 1989 Constitutions of Nigeria" - in University of Benin Law Journal. Vol.2 No. 1 (February 1995), pp. 95-109.

10. "Human Rights and Economic Integration" - in proceedings of the Eight Annual Conference of the African Society of International and Comparative Law – 2-4 September, 1996, pp. 214-230.

11. "The Judicial System and the Protection of Economic, Social and Cultural Rights," in Report on Proceedings of the Seminar on The Protection of Human Rights in Ghana – The Human Rights Study Centre, University of Ghana and The Konrad Adenauer Foundation of Germany, Accra, 1997, pp.81-97.

12. "Religious Freedom and Vestal Virgins: The Trokosi Practice in Ghana' - published in Journal of African Society of International and Comparative Law, 10 RADIC, 1998, pp.193-215.

13. "The African Court of Human Rights: Prospects In Comparison with the European Court of Human Rights and the Inter American Court of Human Rights", in Proceedings of the Tenth Annual Conference of the African Society of International and Comparative Law, pp. 1-19.

14. "The Role of Africa in Arms Control and Disarmament"- in Volume 11(1) of RADIC, the Journal of the African Society of International and Comparative Law, p. 1-19

15. "Legislating Religious Liberty: The Ghanaian Experience,"- in the Brigham Young University Law Review- (Provo, Utah, USA.) Vol 1999 Number 2 pp. 589 – 606.

12

16. "National Human Rights Institutions In Africa: Functions, Strengths and Weaknesses," published in Vol. 11 of ASCIL Proc.

17. "The Constitutional Rights to Freedom of Assembly and Procession in Ghana under the Public Order Act," being published in the University of Ghana Law Journal (UGLJ) Vol. 20 pp. 1 – 25 (acceptance letter available).

18. "Of Rights and Freedoms in the 1992 Constitutional Framework of Ghana," accepted for publication in the University of Ghana Law Journal (UGLJ) Vol. 21

19. "Human Rights Implications of Commital of Judgement Debtor for Contempt" – in 1999  2 Ghana Quarterly Law Journal, pp. 17 – 19.

20. "Illegitimate Child": A human rights Incorrect Concept" – in African Legal Aid Quarterly, July – September 1999, pp. 6 – 10.

21. "Human Rights Implications of the Pinochet Decision" – in 1999 4 Ghana Quarterly Law Journal, pp.18 – 22.


**(b) Book Chapters**

22. Book Title: Regional Integration and Cooperation in West Africa: A Multidimensional Perspective
Editor: Real Lavergne
Chapter Contributed: Chapter 13
           HUMAN RIGHTS  AND INTEGRATION
Publishers, Year of Publication & Pages: Toronto & Asmara: Africa World Press. Inc. & International Development Research Centre (IDRC), 1997, pp.2611 – 277.

23. Book Title: The Protection of Human Rights In African Criminal Proceedings
Editors: M. Cherif Bassouni & Ziyad Motala
Chapter Contributed:
           CRIMINAL    JUSTICE    AND    HUMAN    RIGHTS    IN    LEGAL
           EDUCATION AND POST-PROFESSIONAL EDUCATION
Publishers, Year of Publication & Pages: Dordrecht/Boston/London: Martinus Nijhoff Publishers, 1995, pp.351 –355.

24. Book Title: Constitutions of the Countries of the World (Republic of Ghana) – Release 98-8 Issued December 1998
Editor: Gisbert H. Flanz
Chapter Contributed:
           BACKGROUND TO THE 1996 AMENDMENT TO THE
                CONSTITUTION OF GHANA
Publishers, Year of Publication & Pages: Dobbs Ferry, New York: Oceana Publications,

Inc. 1998, pp. Vii - xv

25. Book Title: Legitimate Governance in Africa: International and Domestic Legal Perspectives
Editors: E. K. Quashigah & O. C. Okafor
Chapter Contributed with O. C. Okafor
> Chapter 1
> LEGITIMATE GOVERNANCE IN AFRICA – INTERNATIONAL AND DOMESTIC LEGAL PERSPECTIVES: AN INTRODUCTION
Publishers, Year of Publication & Pages: The Hague/London/Boston: Kluwer, 1999, p. 1 - 19

26. Book Title: Legitimate Governance in Africa: International and Domestic Legal Perspectives
Editors: E. K. Quashigah & O. C. Okafor
Chapter Contributed:
> Chapter 3
> LEGITIMATE GOVERNANCE: THE PRE-COLONIAL PERSPECTIVE
Publishers, Year of Publication & Pages: The Hague/London/Boston: Kluwer, 1999, p. 43 – 66.

27. Book Title: Legitimate Governance in Africa: International and Domestic Legal Perspectives
Editors: E. K. Quashigah & O. C. Okafor
Chapter Contributed:
> Chapter 16
> LEGITIMATE GOVERNANCE IN AFRICA: THE RESPONSIBILITY OF THE INTERNATIONAL COMMUNITY
Publishers, Year of Publication & Pages: The Hague/London/Boston: Kluwer, 1999, p. 461 – 485.

28. Book Title: Legitimate Governance in Africa: International and Domestic Legal Perspectives
Editors: E. K. Quashigah & O. C. Okafor
Chapter Contributed with O. C. Okafor
> Chapter 19
> TOWARDS THE ENHANCEMENT OF THE RELEVANCE AND EFFECTIVENESS OF THE MOVEMENT FOR LEGITIMATE GOVERNANCE IN AFRICA
Publishers, Year of Publication & Pages: The Hague/London/Boston: Kluwer, 1999, p. 539 - 557.

29. Book Title: National Human Rights Institutions: Articles and Working Papers
Editors: Birgit Lindsnaes, Lone Lindholt, Kristine Yigen
Chapter Contributed:
> Chapter 11

14

THE    GHANA    COMMISSION    ON    HUMAN    RIGHTS    AND
ADMINISTRATIVE JUSTICE

Publishers, Year of Publication & Pages:    The Danish Centre for Human Rights,
Denmark, March, 2000, pp. 155 – 161.

30. Book Title: Contemporary Human Rights Issues in Commonwealth West Africa
Editor: Bernice Sam
Chapter Contributed:
Chapter Three
HUMAN RIGHTS IN THE COMMUNAL SETTING IN WEST AFRICA
Publishers, Year of Publication & Pages: The Commonwealth Human Rights Initiative,
Accra Office, 2003, pp. 49-72.

31. Book Title: Commonwealth West Africa Workshop on Human Rights for Human
Rights Commissions and Human Rights Non-Governmental Organizations (Report)
Editor: The Commonwealth Human Rights Initiative
Chapter Contributed:
Chapter Six
TRUTH AND RECONCILIATION COMMISSIONS IN WEST AFRICA
Publishers, Year of Publication & Pages: The Commonwealth Human Rights Initiative,
Accra Office, 2003, pp. 94-130.

32. Book Title: Ghana: One Decade of the Liberal State, Editor – Kwame Boafo-Arthur
Publishers, Year of Publication & Pages: CODESRIA Books, Zed Books, London/New
York, 2007, pp. 21-48.
Chapter Contributed:
Chapter 2
TRENDS IN THE PROMOTION AND PROTECTION OF HUMAN RIGHTS UNDER
THE 1992 CONSTITUTION

33. Book Title: Ghana Law Since Independence: History, Development and Prospects –
Editors: HJAN Mensa-Bonsu & others
Publishers, Year of Publication & Pages: Black Mask Ltd, Accra, 2007, pp. 119 – 141.
Chapter Contributed:
Chapter 7
THE CONSTITUTION AS EVOLVED BY THE JURISPRUDENCE OF THE COURTS
OF GHANA

**(c) Occasional Paper**
34.    THE AFRICAN CHARTER ON HUMAN AND PEOPLES' RIGHTTS:
TOWARDS A MORE EFFECTIVE REPORTING MECHANISM
Published by the Centre for Human Rights, University of Pretoria, April 2002, as
Occasional Paper No.13.

**ON-GOING WORK**

15

1. Annual Survey of Ghana Law

2. Book on Alternative Dispute Resolution in Ghana

3. Book on Constitutional Law of Ghana

Prof. Kofi Quashigah

GHANA
CONSTITUTION

# CHAPTER EIGHT

# THE EXECUTIVE

*The President*

57.

(1) There shall be a President of the Republic of Ghana who shall be the Head of State and Head of Government and Commander-in Chief of the Armed Forces of Ghana.

(2) The President shall take precedence over all other persons in Ghana; and in descending order, the Vice-President, the Speaker of Parliament and the Chief Justice, shall take precedence over all other persons in Ghana.

(3) Before assuming office the President shall take and subscribe before Parliament the oath of allegiance and the presidential oath set out in the Second Schedule to this Constitution.

(4) Without prejudice to the provisions of article 2 of this Constitution, and subject to the operation of the prerogative writs, the President shall not, while in office, be liable to proceedings in any court for the performance of his functions, or for any act done or omitted to be done, or purported to be done, or purported to have been done or purporting to be done in the performance of his functions, under this Constitution or any other law.

(5) The President shall not, while in office as President, be personally liable to any civil or criminal proceedings in court.

(6) Civil or criminal proceedings may be instituted against a person within three years after his ceasing to be President, in respect of anything done or omitted to be done by him in his personal capacity before or during his term of office notwithstanding any period of limitation except where the proceedings had been legally barred before he assumed the office of President.

58.

(1) The executive authority of Ghana shall vest in the President and shall be exercised in accordance with the provisions of this Constitution.

# EXHIBIT 2

(2) The executive authority of Ghana shall extend to the execution and maintenance of this Constitution and all laws made under or continued in force by this Constitution.

(3) Subject to the provisions of this Constitution, the functions conferred on the President by clause (1) of this article may be exercised by him either directly or through officers subordinate to him.

(4) Except as otherwise provided in this Constitution or by a law not inconsistent with this Constitution, all executive acts of Government shall be expressed to be taken in the name of the President.

(5) A constitutional or statutory instrument or any other instrument made, issued or executed in the name of the President shall be authenticated by the signature of a Minister and the validity of nay such instrument so authenticated shall not be called in question on the ground that it is not made, issued or executed by the President.

59.

The President shall not leave Ghana without prior notification in writing, signed by him and addressed to the Speaker of Parliament.

60.

(1) There shall be a Vice-President of Ghana who shall perform such functions as may be assigned to him by this Constitution or by the President.

(2) A candidate for the office of Vice-President shall be designated by the candidate for the office of President before the election of President.

(3) The provisions of article 62 of this Constitution apply to a candidate for election as Vice-President.

(4) A candidate shall be deemed to be duly elected as Vice-President if the candidate who designated him as candidate for election to the office of Vice-President has been duly elected as President in accordance with the provisions of article 63 of this Constitution.

(5) The Vice-President shall, before commencing to perform the functions of Vice-President, take and subscribe the oath of allegiance and the Vice-Presidential oath set out in the Second Schedule to this Constitution.

(6) Whenever the President dies, resigns or is removed from office, the Vice-President shall assume office as President for the unexpired term of

office of the President with effect from the date of the death, resignation or removal of the President.

(7) Where the unexpired term served by the Vice-President under clause (6) of this article exceeds half the term of a President, the Vice-President is subsequently only eligible to serve one full term as President.

(8) Whenever the President is absent from Ghana or is for any other reason unable to perform the functions of his office, the Vice-President shall perform the function of the President until the President returns or is able to perform.

(9) The Vice-President shall, before commencing to perform the functions of the President under clause (6) of this article, take and subscribe the oath set out in the Second Schedule to this Constitution in relation to the office of President.

(10) The Vice-President shall, upon assuming office as President under clause (6) of this article, nominate a person to the office of Vice-President subject to approval by Parliament.

(11) Where the President and the Vice-President are both unable to perform the functions of the President, the Speaker of Parliament shall perform those functions until the President or the Vice-President is able to perform those factions or a new President assumes office, as the case may be.

(12) The Speaker shall, before commencing to perform the functions of the President under clause (11) of this article, take and subscribe the oath set out in relation to the office of President.

(13) Where the Speaker of Parliament assumes the office of President as a result of the death, resignation or removal from office of the President and the Vice-President, there shall be a presidential election within three months after his assumption of office.

(14) The provisions of article 69 of this Constitution shall apply to the removal from office of the Vice-President.

61.

There shall be a public seal and a presidential seal, the use and custody of which shall, subject to the provisions of this Constitution, be regulated by law.

62.

A person shall not be qualified for election as the President of Ghana unless -

(a) he is a citizen of Ghana by birth;

(b) he has attained the age of forty years; and

(c) he is a person who is otherwise qualified to be elected a Member of Parliament, except that the disqualifications set out in paragraphs (c), (d), and (e) of clause (2) of article 94 of this Constitution shall not be removed, in respect of any such person, by a presidential pardon or by the lapse of time as provided for in clause (5) of that article.

63.

(1) A person shall not be a candidate in a presidential election unless he is nominated for election as President by a document which -

(a) is signed by him; and

(b) is signed by not less than two persons who are registered voters resident in the area of authority of each district assembly;

(c) is delivered to the Electoral Commission on or before the day appointed as nomination day in relation to the election;

(d) designates a person to serve as Vice-President.

(2) The election of the President shall be on the terms of universal adult suffrage and shall, subject to the provisions of this Constitution, be conducted in accordance with such regulations as may be prescribed by constitutional instrument by the Electoral Commission and shall be held so as to begin -

(a) where a President is in office, not earlier than four months nor later than one month before his term of office expires; and

(b) in any other case, within three months after the office of President becomes vacant; and shall be held at such place and shall begin on such date as the Electoral Commission shall, by constitutional instrument, specify.

(3) A person shall not be elected as President of Ghana unless at the presidential election the number of votes cast in his favour is more than fifty per cent of the total number of valid votes cast at the election.

(4) Where at a presidential election there are more than two candidates and no candidate obtains the number or percentage of votes specified in clause (3) of this article a second election shall be held within twenty-one days after the previous election.

(5) The candidates for a presidential election held under clause (4) of this article shall be the two candidates who obtained the two highest numbers of votes at the previous election.

(6) Where at a presidential election three or more candidates obtain the two highest numbers of votes referred to in clause (5) of this article, then unless there are withdrawals such that only two candidates remain, another election shall held within twenty-one days after the previous election at which the candidates who obtained the two highest numbers of votes shall, subject to any withdrawal, be continued until a President is elected.

(7) A presidential candidate under clause (5) or (6) of this article may, be writing under his hand, withdraw his candidature at any time before the election.

(8) If after a second presidential election held under clause (4) of this article the two candidates obtained an equal number of votes, then, notwithstanding any withdrawal, another election shall be held within twenty-one days after the election at which the two candidates shall be the only candidates and the same process shall, subject to any withdrawal, be continued until a President is elected.

(9) An instrument which -

    (a) is executed under the hand of the Chairman of the Electoral Commission and under the seal of the Commission; and

    (b) states that the person named in the instrument was declared elected as the President of Ghana at the election of the President, shall be prima facie evidence that the person named was so elected.

64.

(1) The validity of the election of the President may be challenged only by a citizen of Ghana who may present a petition for the purpose to the Supreme Court within twenty-one days after the declaration of the result of the election in respect of which the petition is presented.

(2) A declaration by the Supreme Court that the election of the President is not valid shall be without prejudice to anything done by the President before the declaration.

(3) The Rules of Court Committee shall, by constitutional instrument, make rules of court for the practice and procedure for petitions to the Supreme Court challenging the election of a President.

65.

The Electoral Commission shall, by constitutional instrument, make regulations for the purpose of giving effect to article 63 of this Constitution.

66.

(1) A person elected as President shall, subject to clause (3) of this article, hold office for a term of four years beginning from the date on which he is sworn in as President.

(2) A person shall not be elected to hold office as President of Ghana for more than two terms.

(3) The office of President shall become vacant -

(a) on the expiration of the period specified in clause (1) of this article; or

(b) if the incumbent dies or resigns from office or ceases to hold office under article 69 of this Constitution.

(4) The President may, by writing signed by him, and addressed to the Speaker of Parliament, resign from his office as President.

67.

The President shall, at the beginning of each session of Parliament and before a dissolution of Parliament, deliver to Parliament a message on the state of the nation.

68.

(1) The President shall not, while he continues in office as President -

(a) hold any other office of profit or emolument whether private or public and whether directly or indirectly; or

(b) hold the office of chancellor or head of any university in Ghana.

(2) The President shall not, on leaving office as President, hold any office of profit or emolument, except with the permission of Parliament, in any establishment, either directly or indirectly, other than that of the State.

(3) The President shall receive such salary, allowances and facilities as may be prescribed by Parliament on the recommendations of the committee referred to in article 71 of this Constitution.

(4) On leaving office, the President shall receive a gratuity in addition to pension, equivalent to his salary and other allowances and facilities prescribed by Parliament in accordance with clause (3) of this article.

(5) The salary, allowances, facilities, pensions and gratuity referred to in clauses (3) and (4) shall be exempt from tax.

(6) Where the President is removed from office under paragraph (c) of clause (1) of article 69 of this Constitution or resigns, he shall be entitled to such pension and other retiring awards and facilities as Parliament may prescribe on the recommendation of the Committee referred to in Article 71 of this Constitution.

(7) The salary and allowances payable to the President and any pension or gratuity payable to him on leaving office shall be charged on the Consolidated Fund.

(8) The salary, allowances, facilities and privileges of the President shall not be varied to his disadvantage while he holds office.

(9) The pension payable to the President and the facilities available to him shall not be varied to his disadvantage during his lifetime.

69.

(1) The President shall be removed from office if he is found, in accordance with the provisions of this article -

    (a) to have acted in willful violation of the oath of allegiance and the presidential oath set out in the Second Schedule to, or in willful violation of any other provision of, this Constitution; or

    (b) to have conducted himself in a manner -

(i) which brings or is likely to bring the high office of President into disrepute, ridicule or contempt; or

(ii) prejudicial or inimical to the economy or the security of the State; or

(c) to be incapable of performing the functions of his office by reason of infirmity of body or mind.

(2) For the purposes of the removal from office of the President, a notice in writing -

(a) signed by not less than one-third of all the members of Parliament, and

(b) stating that the conduct or the physical or mental capacity of the President be investigated on any of the grounds specified in clause (1) of this article, shall be given to the Speaker who shall immediately inform the Chief Justice and deliver the notice to him copied to the President.

(3) The notice referred to in clause (2) of this article shall be accompanied by a statement in writing setting out in detail the facts, supported by the necessary documents, on which it is claimed that the conduct or the physical or mental capacity of the President by investigated for the purposes of his removal from office.

(4) Subject to clause (5) of this article, the Chief Justice shall, by constitutional instrument, immediately convene a tribunal consisting of the Chief Justice as Chairman and the four most senior Justices of the Supreme Court and the tribunal shall inquire, in camera, whether there is a prima facie case for the removal of the President.

(5) Where a notice under clause (2) of this article is delivered to the Chief Justice in respect of the removal from office of the President on the grounds of physical or mental incapacity, the Chief Justice shall, in consultation with the professional head of the Ghana Health Services, causes a medical board to be convened which shall consist of not less than four eminent medical specialists and the President shall be informed accordingly.

(6) The President shall be invited to submit himself for examination by the medical board within fourteen days after the appointment of the board.

(7) The President shall be entitled during the proceedings of the tribunal or of the medical board to be heard in his defence by himself or by a lawyer or other expert or person as the case may be, of his own choice.

(8) The Rules of Court Committee shall, by constitutional instrument, make rules for the practice and procedure of the tribunal or of the medical board for the removal of the President.

(9) Where the tribunal or medical board specified in clauses (4) and (5) of this article determines that there is a prima facie case for the removal of the President or that the President is by reason of physical or mental incapacity unable to perform the functions of his office, the findings shall immediately be submitted to the Speaker of Parliament through the Chief Justice and copied to the President.

(10) Parliament shall, within fourteen days after the date of the findings of the tribunal or medical board, move a resolution whether or not the President shall be removed from office.

(11) The resolution for the removal from office of the President shall be by a secret ballot and shall be taken to be approved by Parliament if supported by the votes of not less that two-thirds of all the members of Parliament after prior debate.

(12) The proceedings of Parliament for the removal of the President shall not be held in camera except where Parliament otherwise orders in the interest of national security.

(13) The President shall cease to hold office as President on the date Parliament decides that he be removed from office.

70.

(1) The President shall, acting in consultation with the Council of State, appoint-

    (a) the Commissioner for Human Rights and Administrative Justice and his Deputies;

    (b) the Auditor-General;

    (c) the District Assemblies Common Fund Administrator;

    (d) the Chairmen and other members of -

        (i) the Public Services Commission;

(ii) the Lands Commission;

(iii) the governing bodies of public corporations;

(iv) a National Council for Higher Education howsoever described; and

(e) the holders of such other offices as may be prescribed by this Constitution or by any other law not inconsistent with this Constitution.

(2) The President shall, acting on the advice of the Council of State, appoint the Chairman, Deputy Chairmen, and other members of the Electoral Commission.

71.

(1) The salaries and allowances payable, and the facilities and privileges available, to-

(a) the Speaker and Deputy Speakers and members of Parliament;

(b) the Chief Justice and the other Justices of the Superior Court of Judicature;

(c) the Auditor-General, the Chairman and Deputy Chairmen of the Electoral Commission, the commissioner for Human Rights and Administrative Justice and his Deputies and the District Assemblies Common Fund Administrator;

(d) the Chairman, Vice-Chairman and the other members of-

(i) a National Council for Higher Education howsoever described;

(ii) the Public Services Commission;

(iii) the National Media Commission;

(iv) the Lands Commission; and

(v) the National Commission for civic Education;

being expenditure charged on the Consolidated Fund, shall be determined by the President on the recommendations of a committee of not more than

five persons appointed by the President, acting in accordance with the advice of the Council of State.

(2) The salaries and allowances payable, and the facilities available, to the President, the Vice-President, the chairman and the other members of the Council of State; Ministers of State and Deputy Ministers, being expenditure charged on the Consolidated Fund, shall be determined by Parliament on the recommendations of the committee referred to in clause (1) of this article.

(3) For the purposes of this article, and except as otherwise provided in this Constitution, "salaries" includes allowances, facilities and privileges and retiring benefits or awards.

72.

(1) The President may, acting in consultation with the Council of State-

(a) grant to a person convicted of an offence a pardon either free or subject to lawful conditions; or

(b) grant to a person a respite, either indefinite or for a specified period, from the execution of punishment imposed on him for an offence; or

(c) substitute a less severe form of punishment for a punishment imposed on a person for an offence; or

(d) remit the whole or part of a punishment imposed on a person or of a penalty or forfeiture otherwise due to Government on account on any offence.

(2) Where a person is sentenced to death for an offence, a written report of the case from the trial judge or judges, together with such other information derived from the record of the case or elsewhere as may be necessary, shall be submitted to the President.

(3) For the avoidance of doubt, it is hereby declared that a reference in this article to a conviction or the imposition of a punishment, penalty, sentence or forfeiture includes a conviction or the imposition of a punishment, penalty, sentence or forfeiture by a court-martial or other military tribunal.

*International Relations*

73.

The Government of Ghana shall conduct its international affairs in consonance with the consonance with the accepted principles of public international law and diplomacy in a manner consistent with the national interest of Ghana.

74.

(1) The President shall, acting in consultation with the Council of State, appoint persons to represent Ghana abroad.

(2) The President may receive envoys accredited to Ghana.

75.

(1) The President may execute or cause to be executed treaties, agreements or conventions in the name of Ghana.

(2) A treaty, agreement or convention executed by or under the authority of the President shall be subject to ratification by-

(a) Act of Parliament; or

(b) a resolution of Parliament supported by the votes of more than on-half of all the members of Parliament.

*The Cabinet*

76.

(1) There shall be a Cabinet which shall consist of the President, the Vice-President and not less than ten and not more than nineteen Ministers of State.

(2) The Cabinet shall assist the President in the determination of general policy of the Government.

(3) There shall be a Secretary to the Cabinet who shall be appointed by the President.

77.

(1) The Cabinet shall be summoned by the President who shall preside at all its meetings; and in the absence of the President, the Vice-President shall preside.

(2) The Cabinet shall regulate the procedure at its meetings.

78.

(1) Ministers of State shall be appointed by the President with the prior approval of Parliament from among members of Parliament or persons qualified to be elected as members of Parliament, except that the majority of Ministers of State shall be appointed from among members of Parliament.

(2) The President shall appoint such number of Ministers of State as may be necessary for the efficient running of the State.

(3) A Minister of State shall not hold any other office of profit or emolument whether private or public and whether directly or indirectly unless otherwise permitted by the Speaker acting on the recommendations of a committee of Parliament on the ground-

(a) that holding that office will not prejudice the work of a Minister; and

(b) that no conflict of interest arises or would arise as a result of the Minister holding that office.

79.

(1) The President may, in consultation with a Minister of State, and with the prior approval of Parliament, appoint one or more Deputy Ministers to assist the Minister in the performance of his functions.

(2) A person shall not be appointed a Deputy Minister unless he is a Member of Parliament or is qualified to be elected as a member of Parliament.

(3) Clause (3) of article 78 applies to a Deputy Minister as it applies to a Minister of State.

80.

A Minister of State or Deputy Minister shall not enter upon the duties of his unless he has taken and subscribed the oath of allegiance, the oath of Minister of State and the Cabinet oath, as the case may be, set out in the Second Schedule to this Constitution.

81.

The office of a Minister of State or a Deputy Minister shall become vacant if-

    (a) his appointment is revoked by the President; or

    (b) he is elected as Speaker or Deputy Speaker; or

    (c) he resigns from office; or

    (d) he dies.

82.

(1) Parliament may, by a resolution supported by the votes of not less than two-thirds of all the members of Parliament, pass a vote of censure on a Minister of State.

(2) A motion for the resolution referred to in clause (1) of this article shall not be moved in Parliament unless-

    (a) seven days' notice has been given of the motion; and

    (b) the notice for the motion has been signed by not less than one-third of all the members of Parliament;

(3) The motion shall be debated in Parliament within fourteen days after the receipt by the Speaker of the notice for the motion.

(4) A Minister of State in respect of whom a vote of censure is debated under clause (3) of this article is entitled, during the debate, to be heard in his defence.

(5) Where a vote of censure is passed against a Minister under this article the President may, unless the Minister resigns his office, revoke his appointment as a Minister.

(6) For the avoidance of doubt this article applies to a Deputy Minister as it applies to a Minister of State.

*The National Security Council*

83.

(1) There shall be a National Security Council which shall consist of-

(a) the President;

(b) the Vice-President;

(c) the Ministers for the time being holding the portfolios of foreign affairs, defence, interior, and finance and such other Ministers as the President may determine;

(d) the Chief of Defense Staff and two other members of the Armed Forces;

(e) the Inspector-General of Police and two other members of the Police Service, one of whom shall be the Commissioner of Police responsible for Criminal Investigations Department;

(f) the Director-General of the Prisons Service;

(g) the Director of External Intelligence;

(h) the Director of Internal Intelligence;

(i) the Director of Military Intelligence;

(j) the Commissioner of Customs, Excise and Preventive Service; and

(k) three persons appointed by the President.

(2) The President shall preside at meetings of the National Security Council and in his absence the Vice-President shall preside.

(3) The President may, acting in consultation with the National Security Council, invite such persons as he considers necessary for any deliberations of the Council.

(4) A person invited to participate in the deliberations of the Council under clause (3) of this article shall not vote on any matter for decision before the Council.

(5) The National Security Council shall regulate the procedure at its meetings.

(6) The Secretary to the Cabinet shall be the Secretary to the National Security Council.

84.

The functions of the National Security Council include-

    (a) considering and taking appropriate measures to safeguard the internal and external security of Ghana;

    (b) ensuring the collection of information relating to the security of Ghana and the integration of the domestic, foreign and security policies relating to it so as to enable the security services and other departments and agencies of the Government to co-operate more effectively in matters relating to national security;

    (c) assessing and appraising the objectives, commitments and risks of Ghana in relation to the actual and potential military power in the interest of national security; and

    (d) taking appropriate measures regarding the consideration of policies on matters of common interest to the departments and agencies of the Government concerned with national security.

85.

No agency, establishment or other organization concerned with national security shall be established except as provided for under this Constitution.

### *National Development Planning Commission*

(1) There shall be a National Development Planning Commission.

(2) The Commission shall consist of-

    (i) a Chairman who shall be appointed by the President in consultation with the Council of State;

    (ii) the Minister responsible for finance and such other Ministers of State as the President may appoint;

    (iii) the Government Statistician;

    (iv) the Governor of the Bank of Ghana;

(v) one representative from each region of Ghana appointed by the Regional Co-ordinating Council of the region;

(vi) such other persons as may be appointed by the President having regard to their knowledge and experience of the relevant areas and roles pertaining to development, economic, social, environmental and spatial planning.

(3) The National Development Planning Commission shall be responsible to the President.

87.

(1) The Commission shall advise the President on development planning policy and strategy.

(2) The Commission shall, at the request of the President or Parliament, or on its own initiative-

(a) study and make strategic analyses of macro-economic and structural reform options;

(b) make proposals for the development of multi-year rolling plans taking into consideration the resource potential and comparative advantage of the different districts of Ghana;

(c) make proposals for the protection of the natural and physical environment;

(d) make proposals for ensuring the even development of the districts of Ghana by the effective utilisation of available resources; and

(e) monitor, evaluate and co-ordinate development policies, programmes and projects.

(3) The Commission shall also perform such other functions relating to development planning as the President may direct.

*The Attorney-General*

88.

(1) There shall be an Attorney-General of Ghana who shall be a Minister of State and the principal legal adviser to the Government.

(2) The Attorney-General shall discharge such other duties of a legal nature as may be referred or assigned to him by the President, or imposed on him by this Constitution or any other law.

(3) The Attorney-General shall be responsible for the initiation and conduct of all prosecutions of criminal offences.

(4) All offences prosecuted in the name of the Republic of Ghana shall be at the suit of the Attorney-General or any other person authorised by him in accordance with any law.

(5) The Attorney-General shall be responsible for the institution and conduct of all civil cases on behalf of the State; and all civil proceedings against the State shall be instituted against the Attorney-General as defendant.

(6) The Attorney-General shall have audience in all courts in Ghana.

GHANA
CONSTITUTION

# CHAPTER TEN

## THE LEGISLATURE

*Composition of Parliament*

93.

(1) There shall be a Parliament of Ghana which shall consist of not less than one hundred and forty elected members.

(2) Subject to the provisions of this Constitution, the legislative power of Ghana shall be vested in Parliament and shall be exercised in accordance with this Constitution.

94.

(1) Subject to the provisions of this article, a person shall not be qualified to be a member of Parliament unless -

(a) he is a citizen of Ghana, has attained the age of twenty-one years and is a registered voter;

(b) he is resident in the constituency for which he stands as a candidate for election to Parliament or has resided there for a total period of not less than five years out of the ten years immediately preceding the election for which he stands, or he hails from that constituency; and

(c) he has paid all his taxes or made arrangements satisfactory to the appropriate authority for the payment of his taxes.

(2) A person shall not be qualified to be a member of Parliament if he -

(a) owes allegiance to a country other than Ghana: or

(b) has been adjudged or otherwise declared-

(i) bankrupt under any law in force in Ghana and has not been discharged or

(ii) to be of unsound mind or is detained as a criminal lunatic under any law in force in Ghana; or

(c) has been convicted -

## EXHIBIT 3

(i) for high crime under this Constitution or high treason or treason or for an offence involving the security of the State, fraud, dishonesty or moral turpitude; or

(ii) for nay other offence punishable by death or by a sentence of not less than ten years; or

(iii) for an offence relating to, or connected with election under a law in force in Ghana at any time; or

(d) has been found by the report of a commission or a committee of inquiry to be incompetent to hold public office or is a person in respect of whom a commission or committee of inquiry has found that while being a public officer he acquired assets unlawfully or defrauded the State or mis-used or abused his office, or willfully acted in a manner prejudicial to the interest of the State, and the findings have not been set aside on appeal or judicial review; or

(e) is under sentence of death or other sentence of imprisonment imposed on him by any court; or

(f) is not qualified to be registered as a voter under any law relating to public elections; or

(g) is other wise disqualified by a law in force at the time of the coming into force of this Constitution, not being inconsistent with a provision of this Constitution.

(3) A person shall not be eligible to be a member of Parliament if he -

(a) is prohibited from standing election by a law in force in Ghana by reason of his holding or acting in an office the functions of which involve a responsibility for or are connected with the conduct of, an election or responsibility for, the compilation or revision of an electoral register; or

(b) is a member of the Police Service, the Prisons Service, the Armed Forces, the Judicial Service, the Legal Service, the Civil Service, the Audit Service, the Parliamentary Service, the Statistical Service, the Fire Service, the Customs, Excise and Preventive Service, the Immigration Service, or the Internal Revenue Service; or

(c) is a Chief.

(4) For the purposes of paragraph (d) of clause (2) of this article, in the case of any finding made by a commission or committee of inquiry which is not a judicial or quasi-judicial commission or committee of inquiry, without prejudice to any appeal against or judicial review of that finding, the finding shall not have the effect of disqualifying a person under that paragraph unless it has been confirmed by a Government white paper.

(5) A person shall not be taken to be disqualified to be a member of Parliament under paragraph (c) or (d) of clause (2) of this article if -

      (a) ten years or more have passed since the end of the sentence or the date for the publication of the report of the commission or committee of inquiry; or

      (b) he has been pardoned.

95.

(1) There shall be a Speaker of Parliament who shall be elected by the members of Parliament from among persons who are members of Parliament or who are qualified to be elected as members of Parliament.

(2) The Speaker shall vacate his office -

      (a) if he becomes a Minister of State or a Deputy Minister, or

      (b) if he resigns from office by writing signed by him and addressed to the Clerk to Parliament; or

      (c) if any circumstances arise that, if he were not Speaker, would disqualify him for election as a member of Parliament; or

      (d) if he is removed from office by a resolution of Parliament supported by the votes of not less than three-quarters of all the members of Parliament.

(3) No business shall be transacted in Parliament other than an election to the office of Speaker, at any time when the office of Speaker is vacant.

(4) A person elected to the office of Speaker shall, before entering upon the duties of his office, take and subscribe before Parliament the oath of allegiance and the Speaker's oath set out in the Second Schedule to this Constitution.

(5) The Speaker shall receive such salary and allowances, and on retirement, such retiring awards as may be determined in accordance with article 71 of this Constitution.

(6) The salary and allowances payable to the Speaker and any retiring awards payable to him on retirement shall be charged on the Consolidated Fund.

(7) The salary and other allowances payable to the Speaker shall not be varied to his disadvantage during his tenure of office.

96.

(1) There shall be two Deputy Speakers of Parliament –

(a) who shall be elected by the members of Parliament from among the members of Parliament; and

(b) both of whom shall not be members of the same political party.

(2) The members of Parliament shall elect a person to the office of Deputy Speaker when Parliament first meets after a dissolution of Parliament and if the office becomes vacant otherwise than by reason of a dissolution of Parliament, at the first sitting off Parliament after the office becomes vacant.

(3) The provisions of clause (2) of article 95 of this Constitution shall apply in the case of a Deputy Speaker.

97.

(1) A member of Parliament shall vacate his seat in Parliament –

(a) upon a dissolution of Parliament; or

(b) if he is elected as Speaker of Parliament; or

(c) if he is absent, without the permission in writing of the Speaker and he is unable to offer a reasonable explanation to the Parliamentary Committee on Privileges from fifteen sittings of a meeting of Parliament during any period that Parliament has been summoned to meet and continues to meet; or

(d) if he is expelled from parliament after having been found guilty of contempt of Parliament by a committee of Parliament; or

(e) if any circumstances arise such that, if he were not a member of Parliament, would cause him to be disqualified or ineligible for election, under article 94 of this Constitution; or

(f) if he resigns from office as a member of Parliament by writing under his hand addressed to the Speaker; or

(g) if he leaves the party of which he was a member at the time of his election to Parliament to join another party or seeks to remain in Parliament as an independent member; or

(h) if he was elected a member of Parliament as an independent candidate and joins a political party.

(2) Notwithstanding paragraph (g) of clause (1) of this article, a merger of parties at the national level sanctioned by the parties' Constitutions or membership of a coalition government of which his original party forms part, shall not affect the status of any member of Parliament.

98.

(1) A member of Parliament shall be paid such salary and allowances and provided with such facilities as may be determined in accordance with article 71 of this Constitution.

(2) A member of Parliament shall not hold any office of profit or emolument, whether private or public and either directly or indirectly, unless permitted to do so by the Speaker acting on the recommendations of a committee of Parliament on the grounds that -

(a) holding that office will not prejudice the work of a member of Parliament; and

(b) no conflict of interest arises or would arise as a result of the member holding that office.

99.

(1) The High Court shall have jurisdiction to hear and determine any question whether -

(a) a person has been validly elected as a member of Parliament or the seat of a member has become vacant; or

(b) a person has been validly elected as a Speaker of Parliament or, having been so elected, has vacated the office of Speaker.

(2) A person aggrieved by the determination of the High Court under this article may appeal to the Court of Appeal.

*Procedure in Parliament*

100.

(1) A member of Parliament shall, before taking his seat in Parliament, take and subscribe before the Speaker and in the presence of the members of Parliament, the oath of allegiance and the oath of a member of parliament set out in the Second Schedule to this Constitution.

(2) A member of Parliament may, before taking the oaths referred to in clause (1) of this article, take part in the election of the Speaker.

101.

The Speaker shall preside in Parliament at all sittings and in his absence a Deputy Speaker shall preside.

102.

A quorum of Parliament, apart from the person presiding, shall be one-third of all the members of Parliament.

103.

(1) Parliament shall appoint standing committees and other committees as may be necessary for the effective discharge of its functions.

(2) The standing committees shall be appointed at the first meeting of Parliament after the election of the Speaker and the Deputy Speakers.

(3) Committees of Parliament shall be charged with such functions, including the investigation and inquiry into the activities and administration of ministries and departments as parliament may determine; and such investigation and inquiries may extend to proposals for legislation.

(4) Every member of Parliament shall be a member of at least one of the standing committees.

(5) The composition of the committees shall, as much as possible, reflect the different shades of opinion in Parliament.

(6) A committee appointed under this article shall have the powers, rights and privileges of the High Court or a Justice of the High Court at a trial for

    (a) enforcing the attendance of witnesses and examining them on oath, affirmation or otherwise;

    (b) compelling the production of documents; and

    (c) issuing a commission or request to examine witnesses abroad.

104.

(1) Except as otherwise provided in this Constitution, matters in Parliament shall be determined by the votes of the majority of members present and voting, with at least half of all the members of Parliament present.

(2) The Speaker shall have neither an original nor casting vote.

(3) Where the votes on any motion are equal it shall be taken to be lost.

(4) Where Parliament is considering a bill to amend the Constitution, or where the voting is in relation to the election or removal of any person under this Constitution or under any other law, voting shall be in secret.

(5) A member who is a party to or a partner in a firm which is a party to a contract with the Government shall declare his interest and shall not vote on any question relating to the contract.

105.

A person who sits or votes in Parliament knowing or having reasonable grounds for knowing that he is not entitled so to do commits an offence and shall be liable on conviction, to such penalty as shall be prescribed by or under an Act of Parliament.

106.

(1) The power of Parliament to make laws shall be exercised by bills passed by parliament and assented to by the President.

(2) No bill, other than such a bill as is referred to in paragraph (a) of article 108 of this Constitution, shall be introduced in parliament unless -

(a) it is accompanied by an explanatory memorandum setting out in detail the policy and principles of the bill, the defects of the existing law, the remedies proposed to deal with those defects and the necessity for its introduction; and

(b) it has been published in the Gazette at least fourteen days before the date of its introduction in Parliament.

(3) A bill affecting the institution of chieftaincy shall not be introduced in Parliament without prior reference to the National House of Chiefs.

(4) Whenever a bill is read the first time in Parliament, it shall be referred to the appropriate committee appointed under article 103 of this Constitution which shall examine the bill in detail and make all such inquiries in relation to it as the committee considers expedient or necessary.

(5) Where a bill has been deliberated upon by the appropriate committee, it shall be reported to Parliament.

(6) The report of the committee, together with the explanatory memorandum to the bill, shall form the basis for a full debate on the bill for its passage, with or without amendments, or its rejection, by Parliament.

(7) Where a bill passed by Parliament is presented to the President for assent he shall signify, within seven days after the refuses to assent to the bill, unless the bill has been referred by the President to the Council of State under article 90 of this Constitution.

(8) Where the President refuses to assent to a bill, he shall, within fourteen days after the refusal -

(a) state in a memorandum to the Speaker any specific provisions of the bill which in his opinion should be reconsidered by Parliament, including his recommendations for amendments if any; or

(b) inform the Speaker that he has referred the bill to the Council of State for consideration and comment under article 90 of this Constitution.

(9) Parliament shall reconsider a bill taking into account the comments made by the President or the Council of State, as the case may be, under clause (8) of this article.

(10) Where a bill reconsidered under clause (9) of this article is passed by Parliament by a resolution supported by the votes of not less than two-thirds of all the members of Parliament, the President shall assent to it within thirty days after passing of the resolution.

(11) Without prejudice to the power of Parliament to postpone the operation of a law, a bill shall not become law until it has been duly passed and assented to in accordance with the provisions of this Constitution and shall not come into force unless it has been published in the Gazette.

(12) The provisions of clauses (7) to (10) of this article shall not apply to a bill certified by the Speaker as a bill to which the provisions of article 108 of this Constitution apply; and accordingly, the President shall give his assent to any such bill when presented for assent.

(13) Where it is determined by a committee of Parliament appointed for the purpose that a particular bill is of an urgent nature, the provisions of the preceding clauses of this article, other than clause (1) and paragraph (a) of clause (2) shall not apply, and accordingly, the President shall give his assent to the bill on its presentation for assent.

(14) A bill introduced in Parliament by or on behalf of the President shall not be delayed for more than three months in any committee of Parliament.

107.

Parliament shall have no power to pass any law -

    (a) to alter the decision or judgement of any court as between the parties subject to that decision or judgement; or

    (b) which operates retrospectively to impose any limitations on, or to adversely affect the personal rights and liberties of any person or to impose a burden, obligation or liability on any person except in the case of a law enacted under articles 178 0r 182 of this Constitution.

108.

Parliament shall not, unless the bill is introduced or the motion is introduced by, or on behalf of, the President -

(a) proceed upon a bill including an amendment to a bill, that, in the opinion of the person presiding, makes provision for any of the following -

> (i) the imposition of taxation or the alteration of taxation otherwise than by reduction; or

> (ii) the imposition of a charge on the Consolidated Fund or other public funds of Ghana or the alteration of any such charge otherwise than by reduction; or

> (iii) the payment, issue or withdrawal from the Consolidated Fund or other public funds of Ghana of any moneys not charged on the Consolidated Fund or any increase in the amount of that payment, issue or withdrawal; or

> (iv) the composition or remission of any debt due to the Government of Ghana; or

(b) proceed upon a motion, including an amendment to a motion, the effect of which, in the opinion of the person presiding, would be to make provision for any of the purpose specified in paragraph (a) of this article.

109.

(1) Parliament may by law regulate professional, trade and business organisations.

(2) The affairs of an organisation referred to in clause (1) of this article shall be conducted on democratic lines.

110.

(1) Subject to the provisions of this Constitution, Parliament may, by standing orders, regulate its own procedure.

(2) Parliament may act notwithstanding a vacancy in its membership, including a vacancy not filled when Parliament first meets after a dissolution of Parliament; and the presence or the participation of a person not entitled to be present or to participate in the proceedings of Parliament shall not invalidate these proceedings.

111.

The Vice-President, or a Minister or Deputy Minister who is not a member of Parliament, shall be entitled to participate in the proceedings of Parliament and shall be accorded all the privileges of a member of Parliament except that he is not entitled to vote or to hold an office in Parliament.

*Summoning, Dissolution, etc.*

112.

(1) A session of Parliament shall be held at such place within Ghana and shall commence at such time as the Speaker may, by constitutional instrument, appoint.

(2) A session of Parliament shall be held at least once a year, so that the period between the last sitting of Parliament in one session and the first sitting of Parliament in the next session does not amount to twelve months.

(3) Notwithstanding any other provision of this article fifteen percent of members of Parliament may request a meeting of Parliament; and the Speaker shall, within seven days after the receipt of the request, summon Parliament.

(4) Subject to clause (2) of article 113 of this Constitution, a general election of members of Parliament shall be held within thirty days before the expiration of the period specified in clause (1) of that article; and a session of Parliament shall be appointed to commence within fourteen days after the expiration of that period.

(5) Whenever a vacancy occurs in Parliament, the Clerk to Parliament shall notify the Electoral commission in writing within seven days after the vacancy occurred, and a by-election shall be held within thirty days after the vacancy occurred.

(6) Notwithstanding clause (5) of this article, a by-election shall not be held within three months before the holding of a general election.

113.

(1) Subject to clause (2) of this article, parliament shall continue for four years from the date of its first sitting and shall then stand dissolved.

(2) At any time when Ghana is actually engaged in war, Parliament may, from time to time by resolution supported by the votes of not less than two-thirds of all the members of Parliament, extend the period of four years specified in clause (1) of this article for not more than twelve months at a time, except that the life of Parliament shall not be extended under this clause for more than four years.

(3) Where, after a dissolution of Parliament but before the holding of a general election, the President is satisfied that owing to the existence of a state of war or of a state of public emergency in Ghana or any part of Ghana, it is necessary to recall Parliament, the President shall cause to be summoned the Parliament that has been dissolved to meet.

(4) Unless the life of Parliament is extended under the provisions of clause (2) of this article, the general election of members of Parliament shall proceed and the Parliament that has been recalled shall, if not sooner dissolved, again stand dissolved on the date appointed for the general election.

114.

(1) A person who has served as a member of Parliament for a period of not less than four years shall be eligible, on ceasing to be a member or on his death, for the payment of such gratuity to him or his personal representatives, as the case may be, as shall be determined by the President, acting in consultation with the Committee referred to in article 71 of this Constitution.

(2) For the purpose of clause (1) of this article, the period of four years specified in that clause shall be interpreted to mean four continuous years, and accordingly, any period when the member is out of office as a member, otherwise than by dissolution of Parliament, shall not be taken into account.

*Privileges and Immunities*

115.

There shall be freedom of speech, debate and proceedings in Parliament and that freedom shall not be impeached or questioned in any court or place out of Parliament.

116.

(1) Subject to the provisions of this article, but without prejudice to the general effect of article 115 of this Constitution, civil or criminal

proceedings shall not be instituted against a member of Parliament in any court or place out of Parliament for any matter or thing brought by him in or before Parliament by petition, bill, motion or otherwise.

(2) Whenever in the opinion of the person presiding in Parliament a statement made by a member is prima facie defamatory of any person, the person presiding shall refer the matter for inquiry to the Parliamentary committee on privileges which shall report its findings to Parliament not later than thirty days after the matter was referred to it.

(3) Where the committee referred to in clause (2) of this article reports to parliament that the statement made by the member is defamatory of any person, the member who made the statement shall, within seven days after that report, render an apology at the bar of Parliament committee on privileges and communicated to the person who has been defamed.

(4) Where a member refuses to render an apology in accordance with clause (3) of this article, the Speaker shall suspend that member for the duration of the session of parliament in which the defamatory statement was made and a member so suspended shall lose his parliamentary privileges, immunities and remuneration, but they shall be restored to him if, at any time before the end of the session, he renders the apology as required by clause (3) of this article.

(5) A person who has made a contemporaneous report of the proceedings in Parliament, including a statement which has been the subject of an inquiry under clause (2) of this article, shall publish the apology referred to in clause (3) of this article or the suspension or the apology referred to in clause (4) of this article with the same prominence as he published the first report.

(6) If a person fails to publish the apology as required by clause (5) of this article, he shall not be protected by privilege.

117.

Civil or criminal process coming from any court or place out of Parliament shall not be served on, or executed in relation to, the Speaker or a member or the clerk to Parliament while he is on his way to, attending at or returning from, any proceedings of Parliament.

118.

(1) Neither the Speaker, nor a member of, nor the Clerk to, Parliament shall be compelled, while attending Parliament to appear as a witness in any court or place out of Parliament.

(2) The certificate of the Speaker that a member or the Clerk is attending the proceedings of Parliament is conclusive evidence of attendance at Parliament.

119.

Neither the Speaker, nor a member of, nor the Clerk to, Parliament shall be required to serve on a jury in any court or place out of Parliament.

120.

Subject to the provisions of this Constitution, a person shall not be under any civil or criminal liability in respect of the publication of -

(a) the text or a summary of any report, papers, minutes, votes and proceedings of Parliament; or

(b) a contemporaneous report of the proceedings of Parliament;

unless it is shown that the publication was effected maliciously or otherwise without good faith.

121.

(1) A person summoned to attend to give evidence or to produce a paper, book, record or other document before Parliament, shall be entitled, in respect of his evidence, or the production of the document, as the case may be, to the same privileges as if he were appearing before a court.

(2) A public officer shall not be required to produce before Parliament a document where -

(a) the Speaker certifies -

(i) that the document belongs to a class of documents, the production of which is injurious to the public interest; or

(ii) that disclosure of the contents of the document will be injurious to the public interest; or

(b) the National Security Council certifies -

(i) that the document belongs to a class of documents, the production of which is prejudicial to the security of the State; or

(ii) that disclosure of the contents of the document will be prejudicial to the security of the State.

(3) Where there is a doubt as to the nature of a document such as is referred to in clause (2) of this article, the Speaker or the National Security Council, as the case may be, shall refer the matter to the Supreme Court for determination whether the production, or the disclosure of the contents, of the document would be injurious to the public interest or, as the case may be, prejudicial to the security of the State.

(4) An answer by a person to a question put by Parliament shall not be admissible in evidence against him in any civil or criminal proceedings out of Parliament, except proceedings for perjury brought under the criminal law.

*Contempt of Parliament*

122.

An act or omission which obstructs or impedes Parliament in the performance of its functions or which obstructs or impedes a member or officer of Parliament in the discharge of his duties, or affronts the dignity of Parliament or which tends either directly or indirectly to produce that result, is contempt of Parliament.

123.

Where an act or omission which constitutes contempt of Parliament is an offence under he criminal law, the exercise by Parliament of the power to punish for contempt shall not be a bar to the institution of proceedings under the criminal law.

*The Parliamentary Service*

124.

(1) There shall be a Parliamentary Service which shall form part of the public services of Ghana.

(2) There shall be a Parliamentary Service Board which shall consist of -

(a) the Speaker, as chairman;

(b) four other members all of whom shall be appointed by the Speaker, acting in accordance with the advice of a committee of Parliament; and

(c) the Clerk to Parliament.

(3) There shall be a Clerk to Parliament who shall be the head of the Parliamentary Service.

(4) The appointment of the Clerk and the other members of his staff in the Parliamentary Service shall be made by the parliamentary Service Board in consultation with the Public Services Commission.

(5) The Parliamentary Service Board shall, with the prior approval of Parliament, make regulations, by constitutional instrument, prescribing the terms and conditions of service of the officers and other employees in the Parliamentary Service and generally for the effective and efficient administration of the Parliamentary Service.

GHANA
CONSTITUTION

# CHAPTER ELEVEN

# THE JUDICIARY

*General*

125.

(1) Justice emanates from the people and shall be administered in the name of the Republic by the Judiciary which shall be independent and subject only to this Constitution.

(2) Citizens may exercise popular participation in the administration of justice through the institutions of public and customary tribunals and the jury and assessor systems.

(3) The judicial power of Ghana shall be vested in the Judiciary, accordingly, neither the President nor Parliament nor any organ or agency of the President or Parliament shall have or be given final judicial power.

(4) The Chief Justice shall, subject to this Constitution, be the Head of the Judiciary and shall be responsible for the administration and supervision of the Judiciary.

(5) The Judiciary shall have jurisdiction in all matters civil and criminal, including matters relating to this Constitution, and such other jurisdiction as Parliament may, by law, confer on it.

126.

(1) The Judiciary shall consist of -

    (a) the Superior Courts of Judicature comprising -

        (i) the Supreme Court;

        (ii) the Court of Appeal; and

        (iii) the High Court and Regional Tribunals.

    (b) such lower courts or tribunals as Parliament may by law establish.

(2) The Superior Courts shall be superior courts of record and shall have the power to commit for contempt to themselves and all such powers as

## EXHIBIT 4

were vested in a court of record immediately before the coming into force of this constitution.

(3) Except as otherwise provided in this Constitution or as may otherwise be ordered by a court in the interest of public morality, public safety or public order, the proceedings of every court shall be held in public.

(4) In the exercise of the judicial power conferred on the Judiciary by this Constitution or any other law, the Superior Courts may, in relation to any matter within their jurisdiction, issue such orders and directions as may be necessary to ensure the enforcement of any judgement, decree or order of those courts.

127.

(1) In the exercise of the judicial power of Ghana, the Judiciary, in both its judicial and administrative functions, including financial administration, is subject only to this Constitution and shall not be subject to the control or direction of any person or authority.

(2) Neither the President nor Parliament nor any person acting under the authority of the President or Parliament nor any other person whatsoever shall interfered with Judges or judicial officers or other persons exercising judicial power, in the exercise of their judicial functions; and all organs and agencies of the State shall accord to the courts such assistance as the courts may reasonably require to protect the independence, dignity and effectiveness of the courts, subject to this Constitution.

(3) A Justice of a Superior Court, or any person exercising judicial power, shall not be liable to any action or suit for any act or omission by him in the exercise of the judicial power.

(4) The administrative expenses of the judiciary, including all salaries, allowances, gratuities and pensions payable to our in respect of, persons serving in the judiciary, shall be charged on the Consolidated Fund.

(5) The salary, allowances, privileges and rights in respect of leave of absence, gratuity, pension and other conditions of service of a Justice of the superior court or any judicial officer or other person exercising judicial power, shall not be varied to his disadvantage.

(6) Funds voted by parliament, or charged on the Consolidated Fund by this Constitution for the Judiciary, shall be released to the Judiciary, in quarterly installments.

(7) For the purposes of clause (1) of this article, "financial administration" includes the operation of banking facilities by the Judiciary without the interference of any person or authority, other than for the purposes of audit by the Auditor-General, of the funds voted by Parliament or charged on the Consolidated Fund by this Constitution or any other law, for the purposes of defraying the expenses of the Judiciary in respect of which the funds were voted or charged.

*The Supreme Court*

128.

(1) The Supreme court shall consist of the Chief Justice and not less than nine other Justices of the Supreme Court.

(2) The Supreme Court shall be duly constituted for its work by not less than five Supreme Court Justices except as otherwise provided in article 133 of this Constitution.

(3) The Chief Justice shall preside at sittings of the Supreme Court and in his absence, the most senior of the Justices of the Supreme Court, as constituted, shall preside.

(4) A person shall not be qualified for appointment as a Justice of the Supreme Court unless he is of high moral character and proven integrity and is of not less than fifteen years' standing as a lawyer.

129.

(1) The Supreme Court shall be the final court of appeal and shall have such appellate and other jurisdiction as may be conferred on it by this Constitution or by any other law.

(2) The Supreme Court shall not be bound to follow the decisions of any other court.

(3) The Supreme Court may, while treating its own previous decisions as normally binding, depart from a previous decision when it appears to it right to do so; and all other courts shall be bound to follow the decisions of the Supreme Court on questions of law.

(4) For the purposes of hearing and determining a matter within its jurisdiction and the amendment, execution or the enforcement of a judgement or order made on any matter, and for the purposes of any other authority, expressly or by necessary implication given to the Supreme Court by this Constitution or any other law, the Supreme Court shall have

all the powers, authority and Jurisdiction vested in any court established by this Constitution or any other law.

130.

(1) Subject to the jurisdiction of the High Court in the enforcement of the Fundamental Human Rights and Freedoms as provided in article 33 of this Constitution, the Supreme Court shall have exclusive original jurisdiction in -

    (a) all matters relating to the enforcement or interpretation of this Constitution; and

    (b) all matters arising as to whether an enactment was made in excess of the powers conferred on Parliament or any other authority or person by law or under this Constitution.

(2) Where an issue that relates to a matter or question referred to in clause (1) of this article arises in any proceedings in a court other than the Supreme Court, that court shall stay the proceedings and refer the question of law involved to the Supreme Court for determination; and the court in which the question arose shall dispose of the case in accordance with the decision of the Supreme Court.

131.

(1) An appeal shall lie from a judgement of the Court of Appeal to the Supreme Court-

    (a) as of right in a civil or criminal cause or matter in respect of which an appeal has been brought to the Court of Appeal from a judgment of the High Court or a Regional Tribunal in the exercise of its original jurisdiction; or

    (b) with the leave of the Court of Appeal, in any other cause or matter, where the case was commenced in a court lower than the High Court or a Regional Tribunal and where the Court of Appeal is satisfied that the case involves a substantial question of law or is in the public interest.

(2) Notwithstanding clause (1) of this article, the Supreme Court may entertain application for special leave to appeal to the Supreme Court in any cause or matter, civil or criminal, and may grant leave accordingly.

(3) The Supreme Court shall have appellate jurisdiction, to the exclusion of the Court of Appeal, to determine matters relating to the conviction or otherwise of a person for high treason or treason by the High Court.

(4) An appeal from a decision of the Judicial Committee of the National House of Chiefs shall lie to the Supreme Court with the leave of that Judicial Committee or the Supreme Court.

132.

The Supreme Court shall have supervisory jurisdiction over all courts and over any adjudicating authority and may, in the exercise of that supervisory jurisdiction, issue orders and directions for the purpose of enforcing or securing the enforcement of its supervisory power.

133.

(1) The Supreme Court may review any decision made or given by it on such grounds and subject to such conditions as may be prescribed by rules of court.

(2) The Supreme Court, when reviewing its decisions under this article, shall be constituted by not less than seven Justices of the Supreme Court.

134.

A single Justice of the Supreme Court may exercise power vested in the Supreme Court not involving the decision of the cause or matter before the Supreme Court, except that -

(a) in criminal matters, where that Justice refuses or grants an application in the exercise of any such power, a person affected by it is entitled to have the application determined by the Supreme Court constituted by three Justices of the Supreme Court and

(b) in civil matters, any order, direction or decision made or given under this article may be varied, discharged or reversed by the Supreme Court constituted by three Justices of the Supreme Court.

135.

(1) The Supreme Court shall have exclusive jurisdiction to determine whether an official document shall not be produced in court because its production or the disclosure of its contents will be prejudicial to the security of the State or will be injurious to the public interest.

(2) Where any issue referred to in clause (1) of this article arises as to the production or otherwise of an official document in any proceedings before any court, other than the Supreme Court, the proceedings in that other court shall be suspended while the Supreme Court examines the document and determines whether the document should be produced or not; and the Supreme Court shall make the appropriate order.

(3) The proceedings of the Supreme Court as to whether an official document may be produced shall be held in camera.

136.

(1) The Court of Appeal shall consist of -

(a) the Chief Justice;

(b) subject to clauses (2) and (3) of this article, not less than ten Justices of the Court of Appeal; and

(c) such other Justices of the Superior Court of Judicature as the Chief Justice may, for the determination of a particular cause or matter by writing signed by him, request to sit in the Court of Appeal for any specified period.

(2) The Court of Appeal shall be duly constituted by any three of the Justices referred to in clause (1) of this article and when so constituted, the most senior of the justices shall preside.

(3) A person shall not be qualified for appointment as a Justice of the Court of Appeal unless he is of high moral character and proven integrity and is of not less than twelve years' standing as a lawyer.

(4) The Chief Justice may create such divisions of the Court of Appeal as he considers necessary to sit in such places as he may determine.

(5) Subject to clause (3) of article 129 of this Constitution, the Court of Appeal shall be bound by its own previous decisions; and all courts lower than the Court of Appeal shall follow the decisions of the Court of Appeal on questions of law.

137.

(1) The Court of Appeal shall have jurisdiction throughout Ghana to hear and determine, subject to the provisions of this Constitution, appeals from a judgement, decree or order of the High Court and Regional Tribunals

and such other appellate jurisdiction as may be conferred on it by this Constitution or any other law.

(2) Except as otherwise provided in this Constitution, an appeal shall lie as of right from a judgement, decree or order of the High Court and a Regional Tribunal to the Court of Appeal.

(3) For the purposes of hearing and determining an appeal within its jurisdiction and the amendment, execution or the enforcement of a judgment or order made on any appeal, and, for the purposes of any other authority expressly or by necessary implication given to the Court of Appeal by this Constitution or any other law, the Court of Appeal shall have all the powers, authority and jurisdiction vested in the court from which the appeal is brought.

138.

A single Justice of the Court of Appeal may exercise a power vested in the Court of Appeal not involving the decision of a cause or matter before the Court of Appeal, except that -

    (a) in criminal matters, where that Justice refuses or grants an application in the exercise of any such power conferred by this article, may be varied, discharged or reversed by the Court of Appeal as duly constituted.

*The High Court*

139.

(1) The High Court shall consist of -

    (a) the Chief Justice

    (b) not less than twenty Justices of the High Court; and

    (c) such other Justice of the Superior Court of Judicature as the Chief Justice may, by writing signed by him, request to sit as High Court Justice for any period.

(2) The High Court shall be constituted -

    (a) by a single Justice of the Court; or

    (b) by a single Justice of the Court and jury; or

(c) by a single Justice of the Court with assessors; or

(d) by three Justices of the Court for the trial of the offence of high treason or treason as required by article 19 of this Constitution.

(3) There shall be in the High Court such divisions consisting of such number of Justice respectively as the Chief Justice may determine.

(4) A person shall not be qualified for appointment as a Justice of the High Court unless he is a person of high moral character and proven integrity and is of at least ten years' standing as a lawyer.

140.

(1) The High Court shall, subject to the provisions of this Constitution, have jurisdiction in all matters and in particular, in civil and criminal matters and such original, appellate and other jurisdiction as may be conferred on it by this Constitution or any other law.

(2) The High Court shall have jurisdiction to enforce the Fundamental Human Rights and Freedoms guaranteed by this Constitution.

(3) The High Court shall have no power, in a trial for the offence of high treason or treason, to convict any person for an offence other than treason or treason.

(4) A Justice of the High Court may, in accordance with rules of court, exercise in court or in chambers, all or any of the jurisdiction vested in the High Court by this Constitution or any other law.

(5) For the purposes of hearing and determining an appeal within its jurisdiction and the amendment, execution or the enforcement of a judgment or order made on any appeal, and for the purposes of any other authority, expressly or by necessary implication given to the High Court by this Constitution or any other law, the High Court shall have all the powers, authority and jurisdiction vested in the Court from which the appeal is brought.

141.

The High Court shall have supervisory jurisdiction over all lower courts and any lower adjudicating authority; and may, in the exercise of that jurisdiction, issue orders and directions for the purpose of enforcing or securing the enforcement of its supervisory powers

*Regional Tribunals*

142.

(1) There shall be established in each region of Ghana such Regional Tribunals as the chief Justice may determine.

(2) A Regional Tribunal shall consist of –

    (a) the Chief Justice;

    (b) one Chairman; and

    (c) such members who may or may not be lawyers as shall designated by the Chief Justice to sit as panel members of a Regional Tribunal and for such period as shall be specified in writing by the Chief Justice.

(3) A Region Tribunal shall be duly constituted by a panel consisting of the Chairman and not less than two other panel members.

(4) A person shall not be appointed to be a Chairman of a Regional Tribunal unless he is qualified to be appointed a Justice of the High Court.

(5) A panel member of a Regional Tribunal shall be a person of high moral character and proven integrity.

143.

(1) A Regional Tribunal shall have jurisdiction to try such offences against the State and the public interest as Parliament may, by law, prescribe.

(2) A Regional Tribunal shall have such appellate jurisdiction relating to the matters described in clause (1) of this article, as may be prescribed by law.

(3) For the purpose of hearing and determining an appeal within its jurisdiction and the amendment, execution or enforcement of a judgment or order on any appeal, and for the purposes of any other authority expressly or by necessary implication given to it by this Constitution or any other law, a Regional Tribunal shall have all the powers, authority and jurisdiction vested in the tribunal from which the appeal is brought.

Appointment, retirement and removal of Justices of Superior Courts and chairmen and other members of Regional Tribunals.

144.

(1) The Chief Justice shall be appointed by the President acting in consultation with the Council of State and with the approval of Parliament.

(2) The other Supreme Court Justices shall be appointed by the President acting on the advice of the Judicial Council, in consultation with the Council of State and with the approval of Parliament,

(3) Justices of the Court of Appeal and of the High Court and Chairmen of Regional Tribunals shall be appointed by the President acting on the advice of the judicial Council.

(4) Panel members of Regional Tribunals other than the Chairmen shall be appointed by the Chief Justice in consultation with the Regional Co-ordinating Council for the region and on the advice of the Judicial Council.

(5) Justices of the Superior Courts and Chairmen of Regional Tribunals shall be appointed by warrant under the hand of the President and sealed by the Presidential seal.

(6) Where the office of Chief Justice is vacant, or where the Chief Justice is for any reason unable to perform the functions of his office -

(a) until a person has been appointed to, and has assumed the functions of, that office; or

(b) until the person holding that office has resumed the functions of that office; as the case may be, those functions shall be performed by t he most senior of the Justices of the Supreme Court.

(7) The office of a Justice of the Superior Court shall not be abolished while there is a substantive holder in office.

(8) A Chairman of a Regional Tribunal shall enjoy the same salary, allowances, and gratuity and pension conditions as a Justice of the High Court.

(9) Where the office of a Justice of the High Court or a Chairman of the Regional Tribunal is vacant or for any reason, a Justice of the High Court or a chairman of the Regional Tribunal is unable to perform the functions of his office, or if the Chief Justice advises the President that the state of business in the High Court or Regional Tribunal so requires, the President may, acting in accordance with the advice of the Judicial Council, appoint

a person who has held office as, or a person qualified for appointment as, a Justice of the High Court or a Chairman of the Regional Tribunal to act as a Justice of the High Court or a chairman of the Regional Tribunal.

(10) A person appointed under clause (9) of this article to act as a Justice of the High Court or a Chairman of the Regional Tribunal shall continue to act for the period of his appointment or, where no period is specified, until his appointment is revoked by the President, acting in accordance with the advice of the Judicial Council.

(11) Notwithstanding the expiration of the period of his appointment or the revocation of his appointment under clause (9) of this article, a person appointed under clause (9) of this article may thereafter continue to act for a period not exceeding six months, to enable him to deliver judgment or do any other thing in relation to proceedings that were commenced before him previous to the expiration or revocation.

145.

(1) A Justice of a Superior Court or a Chairman of a Regional Tribunal may retire at anytime after attaining the age of sixty years.

(2) A Justice of a superior court or a Chairman of a Regional Tribunal shall vacate his office -

    (a) in the case of a Justice of the Supreme Court or the Court of Appeal, on attaining the age of seventy years; or

    (b) in the case of a Justice of the High Court or a Chairman of a Regional Tribunal, on attaining the age of sixty-five years; or

    (c) upon his removal from office in accordance with article 146 of this Constitution.

(3) A Justice of the Superior court of Judicature or a Chairman of a Regional Tribunal may resign his office by writing signed by him and addressed to the President.

(4) Notwithstanding that he has attained the age at which he is required by this article to vacate his office, a person holding office as a Justice of a Superior Court or Chairman of a Regional Tribunal may continue in office for a period not exceeding six months after attaining that age, as may be necessary to enable him to deliver judgment or do any other thing in relation to proceedings that were commenced before him previous to his attaining that age.

146.

(1) A Justice of the Superior Court or a Chairman of the Regional Tribunal shall not be removed from office except for stated misbehaviour or incompetence or on ground of inability to perform the functions of his office arising from infirmity of body or mind.

(2) A Justice of the Superior Court of Judicature or a Chairman of the Regional Tribunal may only be removed in accordance with the procedure specified in this article.

(3) If the President receives a petition for the removal of Justice of a Superior Court other than the Chief Justice or for the removal of the Chairman of a Regional Tribunal, he shall refer the petition to the Chief Justice, who shall determine whether there is a prima facie case.

(4) Where the Chief Justice decides that there is a prima facie case, he shall set up a committee consisting of three Justices of the Superior Courts or Chairmen of the Regional Tribunals or both, appointed by the Judicial council and two other persons who are not members of the Council of State, nor members of Parliament, nor lawyers, and who shall be appointed by the Chief Justice on the advice of the Council of State.

(5) The committee appointed under clause (4) of this article shall investigate the complaint and shall make its recommendations to the Chief Justice who shall forward it to the President.

(6) Where the petition is for the removal of the Chief Justice, the President shall, acting in consultation with the Council of State, appoint a committee consisting of two Justices of the Supreme Court, one of whom shall be appointed chairman by the President, and three other persons who are not members of the Council of State, nor members of Parliament, nor lawyers.

(7) The committee appointed under clause (6) of this article shall inquire into the petition and recommend to the President whether the Chief Justice ought to be removed from office.

(8) All proceedings under this article shall be held in camera, and the Justice or Chairman against whom the petition is made is entitled to be heard in his defence by himself or by a lawyer or other expert of his choice.

(9) The President shall, in each case, act in accordance with the recommendations of the committee.

(10) Where a petition has been referred to a committee under this article, the President may –

    (a) in the case of the Chief Justice, acting in accordance with the advice of the Council of State, by warrant signed by him, suspend the Chief Justice;

    (b) in the case of any other Justice of a Superior court or of a Chairman of a Regional Tribunal, acting in accordance with the advice of the Judicial Council, suspend that Justice or that Chairman of a Regional Tribunal.

(11) The President may, at any time, revoke a suspension under this article.

147.

(1) A panel member of a Regional Tribunal, other than the Chairman, shall have such allowances and benefits as may be determined by the President acting on the advice of the Judicial Council.

(2) A panel member of a Regional Tribunal other than the Chairman may be removed by the Chief Justice acting on the advice of the Judicial Council and of the Regional Co-ordinating Council on grounds of stated misbehaviour or incompetence or on ground of inability to perform his functions arising from infirmity of body or mind.

(3) For the purposes of clause (2) of this article the panel member concerned is entitled to be heard in his defence by himself or by a lawyer or other expert of his choice.

*Appointment, retirement and removal of Judicial Officers*

148.

Subject to the provisions of this article, the power to appoint persons to hold or to act in a judicial office shall be vested, subject to the approval of the President in the Chief Justice acting on the advice of the Judicial Council.

149.

Judicial officers shall received such salaries, allowances, facilities and privileges and other benefits as the President may, acting on the advice of the Judicial Council determine.

150.

(1) A judicial officer -

(a) may retire from his office at any time after attaining the age of forty-five years; and

(b) shall vacate his office on attaining the age of sixty years.

(2) A judicial officer may resign his office by writing addressed to the Chief Justice.

151.

(1) A person holding a judicial office may be removed from office by the Chief Justice on grounds only of stated misbehaviour, incompetence or inability to perform his functions arising from infirmity of body or mind and upon a resolution supported by the votes of not less than two-thirds of all the members of the Judicial Council.

(2) For the purpose of clause (1) of this article, the judicial officer shall be entitled to be heard in his defence by himself or by a lawyer or other expert of his choice.

152.

(1) A panel member of a lower court or tribunal other than the person presiding -

(a) shall be appointed by the Chief Justice acting on the advice of the Judicial Council and in consultation with the relevant District Assembly from among persons of high moral character and proven integrity;

(b) shall be paid such allowances and benefits as the Judicial Council may determine; and

(c) may be removed by the Chief Justice on the advice of the Judicial Council on ground of stated misbehaviour, incompetence or inability to perform his functions arising from infirmity of body or mind.

(2) For the purpose of paragraph (c) of this article the panel member concerned is entitled to be heard in his defence by himself or by a lawyer or other expert of his choice.

*The Judicial Council*

153.

There shall be a Judicial Council which shall comprise the following persons -

(a) the Chief Justice who shall be Chairman;

(b) the Attorney-General;

(c) a Justice of the Supreme Court nominated by the Justices of the Supreme court;

(d) a Justice of the Court of Appeal nominated by the Justices of the Court of Appeal;

(e) a Justice of the High court nominated by the Justices of the High Court;

(f) two representatives of the Ghana Bar Association one of whom shall be a person of not less than twelve years' standing as a lawyer.

(g) a representative of the Chairmen of Regional Tribunals nominated by the Chairmen;

(h) a representative of the lower courts or tribunals;

(i) the Judge Advocate-General of the Ghana Armed Forces;

(j) the Head of the Legal Directorate of the Police Service;

(k) the Editor of the Ghana Law Reports;

(l) a representative of the Judicial Service Staff Association nominated by the Association;

(m) a chief nominated by the National House of Chiefs; and

(n) four other persons who are not lawyers appointed by the President

154.

(1) The functions of the Judicial Council are -

(a) to propose for the consideration of Government, judicial reforms to improve the level of administration of justice and efficiency in the Judiciary;

(b) to be a forum for consideration and discussion of matters relating to the discharge of the functions of the Judiciary and thereby assist the Chief Justice in the performance of his duties with a view to ensuring efficiency and effective realization of justice; and

(c) to perform any other functions conferred on it by or under this Constitution or any other law not inconsistent with this Constitution.

(2) The Judicial Council may establish such committees as it considers necessary to which it shall refer matters relating to the Judiciary.

*Miscellaneous*

155.

(1) Notwithstanding the provisions of this Chapter, a Justice of the Superior Court of Judicature who has attained the age of sixty years or above, shall, on retiring, in addition to any gratuity payable to him, be paid a pension equal to the salary payable for the time being to a Justice of the Superior Court from which he retired where -

(a) he has served for ten continuous years or more as a Justice of the Superior Court of Judicature; or

(b) he has served for twenty years or more in the public service at least five continuous years of which were as a Justice of the Superior Court of Judicature; and upon retirement under this clause, he shall not hold any private office of profit or emolument whether directly or indirectly.

(2) For the avoidance of doubt, the pension paid to a person under clause (1) of this article shall be subject to the same changes and increases as the salary of a serving Justice of the Superior Court of Judicature.

(3) A Justice of the Superior Court of Judicature may, in lieu of retiring under clause (1) of this article, retire if he has attained the age prescribed as retiring age for public officers generally, and shall be paid retiring awards based on his total public service, including service as a Justice of the Superior Court of Judicature, but otherwise at the same rate as is, for the time being applicable to the public service generally.

156.

(1) A Justice of a Superior Court, the Chairman of a Regional Tribunal, and also a person presiding over a lower court or tribunal, and any other judicial officer or person whose functions involve the exercise by him of judicial power shall, before assuming the exercise of the duties of his office, take and subscribe the oath of allegiance and the Judicial Oath set out in the Second Scheduled to this Constitution.

(2) The President may, on the advice of the Chief Justice, direct that any other person connected with the exercise of judicial power, shall take and subscribe the Judicial Oath.

(3) The oath of allegiance and the judicial oath required by this article shall be taken and subscribed

(a) in the case of the Chief Justice or other justice of a Superior Court, and a Chairman of a Regional Tribunal, before the President; and

(b) in the case of any other person, before the Chief Justice or before any other Justice of a Superior Court or Chairman of a Regional Tribunal as the Chief Justice may direct.

157.

(1) There shall be a Rules of Court Committee which shall consist of -

(a) the Chief Justice, who shall be Chairman;

(b) six members of the Judicial Council other than the chief Justice nominated by the Judicial Council;

(c) two lawyers, one of not less than ten and the other of not more than five years' standing, both of whom shall be nominated by the Ghana Bar Association.

(2) The Rules of Court Committee shall, by constitutional instrument, make rules and regulations for regulating the practice and procedure of all courts in Ghana.

(3) Without prejudice to clause (2) of this article, no person sitting in a superior Court for the determination of any cause or matter shall, having heard the arguments of the parties to that cause or matter and before judgment is delivered, withdraw as a member of the court or tribunal, or as a member of panel determining that cause or matter, nor shall that person

become functus officio in respect of that cause or matter, until judgment is delivered.

158.

(1) The appointment of officers and employees of the Courts other than those expressly provided for by other provisions of this Constitution, shall be made by the Chief Justice or other Justice or other officer of the Court as the Chief Justice may direct in writing.

(2) The Judicial Council shall, acting in consultation with the Public Services Commission and with the prior approval of the President, by constitutional instrument, make regulations prescribing the terms and conditions of service of the persons to whom clause (1) of this article applies.

159.

The Chief Justice may, acting in accordance with the advice of the Judicial Council and with the approval of the President, by constitutional instrument, make regulations for the efficient performance of the functions of the Judicial Service and the Judicial Council under this Chapter.

160.

The fees, fines and other moneys paid to the Courts shall form part of the Consolidated Fund.

162.

In this Chapter, unless the context otherwise requires -

1. "court" includes a tribunal;

2. "judicial office" means -

(a) the office of a person presiding over a lower court or tribunal howsoever described;

(b) the office of the Judicial Secretary or Registrar of the Superior Courts;

(c) such other offices connected with any court as may be prescribed by constitutional instrument made by the Chief Justice acting in accordance with the advice of the Judicial Council and with the

approval of the President; "judicial officer" means
the holder of a judicial office; and

3. "supervisory jurisdiction" includes jurisdiction to issue writs or
orders in the nature of habeas corpus, certiorari, mandamus,
prohibition and quo warranto.

GHANA
CONSTITUTION

# CHAPTER EIGHT

# THE EXECUTIVE

*The President*

57.

(1) There shall be a President of the Republic of Ghana who shall be the Head of State and Head of Government and Commander-in-Chief of the Armed Forces of Ghana.

(2) The President shall take precedence over all other persons in Ghana; and in descending order, the Vice-President, the Speaker of Parliament and the Chief Justice, shall take precedence over all other persons in Ghana.

(3) Before assuming office the President shall take and subscribe before Parliament the oath of allegiance and the presidential oath set out in the Second Schedule to this Constitution.

(4) Without prejudice to the provisions of article 2 of this Constitution, and subject to the operation of the prerogative writs, the President shall not, while in office, be liable to proceedings in any court for the performance of his functions, or for any act done or omitted to be done, or purported to be done, or purported to have been done or purporting to be done in the performance of his functions, under this Constitution or any other law.

(5) The President shall not, while in office as President, be personally liable to any civil or criminal proceedings in court.

(6) Civil or criminal proceedings may be instituted against a person within three years after his ceasing to be President, in respect of anything done or omitted to be done by him in his personal capacity before or during his term of office notwithstanding any period of limitation except where the proceedings had been legally barred before he assumed the office of President.

58.

(1) The executive authority of Ghana shall vest in the President and shall be exercised in accordance with the provisions of this Constitution.

**EXHIBIT 5**

(2) The executive authority of Ghana shall extend to the execution and maintenance of this Constitution and all laws made under or continued in force by this Constitution.

(3) Subject to the provisions of this Constitution, the functions conferred on the President by clause (1) of this article may be exercised by him either directly or through officers subordinate to him.

(4) Except as otherwise provided in this Constitution or by a law not inconsistent with this Constitution, all executive acts of Government shall be expressed to be taken in the name of the President.

(5) A constitutional or statutory instrument or any other instrument made, issued or executed in the name of the President shall be authenticated by the signature of a Minister and the validity of nay such instrument so authenticated shall not be called in question on the ground that it is not made, issued or executed by the President.

59.

The President shall not leave Ghana without prior notification in writing, signed by him and addressed to the Speaker of Parliament.

60.

(1) There shall be a Vice-President of Ghana who shall perform such functions as may be assigned to him by this Constitution or by the President.

(2) A candidate for the office of Vice-President shall be designated by the candidate for the office of President before the election of President.

(3) The provisions of article 62 of this Constitution apply to a candidate for election as Vice-President.

(4) A candidate shall be deemed to be duly elected as Vice-President if the candidate who designated him as candidate for election to the office of Vice-President has been duly elected as President in accordance with the provisions of article 63 of this Constitution.

(5) The Vice-President shall, before commencing to perform the functions of Vice-President, take and subscribe the oath of allegiance and the Vice-Presidential oath set out in the Second Schedule to this Constitution.

(6) Whenever the President dies, resigns or is removed from office, the Vice-President shall assume office as President for the unexpired term of

CONSTITUTION

# CHAPTER TEN

# THE LEGISLATURE

*Composition of Parliament*

93.

(1) There shall be a Parliament of Ghana which shall consist of not less than one hundred and forty elected members.

(2) Subject to the provisions of this Constitution, the legislative power of Ghana shall be vested in Parliament and shall be exercised in accordance with this Constitution.

94.

(1) Subject to the provisions of this article, a person shall not be qualified to be a member of Parliament unless -

(a) he is a citizen of Ghana, has attained the age of twenty-one years and is a registered voter;

(b) he is resident in the constituency for which he stands as a candidate for election to Parliament or has resided there for a total period of not less than five years out of the ten years immediately preceding the election for which he stands, or he hails from that constituency; and

(c) he has paid all his taxes or made arrangements satisfactory to the appropriate authority for the payment of his taxes.

(2) A person shall not be qualified to be a member of Parliament if he -

(a) owes allegiance to a country other than Ghana: or

(b) has been adjudged or otherwise declared-

(i) bankrupt under any law in force in Ghana and has not been discharged or

(ii) to be of unsound mind or is detained as a criminal lunatic under any law in force in Ghana; or

(c) has been convicted -

## EXHIBIT 6

GHANA
CONSTITUTION

# CHAPTER ELEVEN

## THE JUDICIARY

*General*

125.

(1) Justice emanates from the people and shall be administered in the name of the Republic by the Judiciary which shall be independent and subject only to this Constitution.

(2) Citizens may exercise popular participation in the administration of justice through the institutions of public and customary tribunals and the jury and assessor systems.

(3) The judicial power of Ghana shall be vested in the Judiciary, accordingly, neither the President nor Parliament nor any organ or agency of the President or Parliament shall have or be given final judicial power.

(4) The Chief Justice shall, subject to this Constitution, be the Head of the Judiciary and shall be responsible for the administration and supervision of the Judiciary.

(5) The Judiciary shall have jurisdiction in all matters civil and criminal, including matters relating to this Constitution, and such other jurisdiction as Parliament may, by law, confer on it.

126.

(1) The Judiciary shall consist of -

    (a) the Superior Courts of Judicature comprising -

        (i) the Supreme Court;

        (ii) the Court of Appeal; and

        (iii) the High Court and Regional Tribunals.

    (b) such lower courts or tribunals as Parliament may by law establish.

(2) The Superior Courts shall be superior courts of record and shall have the power to commit for contempt to themselves and all such powers as

## EXHIBIT 7

GHANA
CONSTITUTION

were vested in a court of record immediately before the coming into force of this constitution.

(3) Except as otherwise provided in this Constitution or as may otherwise be ordered by a court in the interest of public morality, public safety or public order, the proceedings of every court shall be held in public.

(4) In the exercise of the judicial power conferred on the Judiciary by this Constitution or any other law, the Superior Courts may, in relation to any matter within their jurisdiction, issue such orders and directions as may be necessary to ensure the enforcement of any judgement, decree or order of those courts.

127.

(1) In the exercise of the judicial power of Ghana, the Judiciary, in both its judicial and administrative functions, including financial administration, is subject only to this Constitution and shall not be subject to the control or direction of any person or authority.

(2) Neither the President nor Parliament nor any person acting under the authority of the President or Parliament nor any other person whatsoever shall interfered with Judges or judicial officers or other persons exercising judicial power, in the exercise of their judicial functions; and all organs and agencies of the State shall accord to the courts such assistance as the courts may reasonably require to protect the independence, dignity and effectiveness of the courts, subject to this Constitution.

(3) A Justice of a Superior Court, or any person exercising judicial power, shall not be liable to any action or suit for any act or omission by him in the exercise of the judicial power.

(4) The administrative expenses of the judiciary, including all salaries, allowances, gratuities and pensions payable to our in respect of, persons serving in the judiciary, shall be charged on the Consolidated Fund.

(5) The salary, allowances, privileges and rights in respect of leave of absence, gratuity, pension and other conditions of service of a Justice of the superior court or any judicial officer or other person exercising judicial power, shall not be varied to his disadvantage.

(6) Funds voted by parliament, or charged on the Consolidated Fund by this Constitution for the Judiciary, shall be released to the Judiciary, in quarterly installments.

**EXHIBIT 8**

(7) For the purposes of clause (1) of this article, "financial administration" includes the operation of banking facilities by the Judiciary without the interference of any person or authority, other than for the purposes of audit by the Auditor-General, of the funds voted by Parliament or charged on the Consolidated Fund by this Constitution or any other law, for the purposes of defraying the expenses of the Judiciary in respect of which the funds were voted or charged.

*The Supreme Court*

128.

(1) The Supreme court shall consist of the Chief Justice and not less than nine other Justices of the Supreme Court.

(2) The Supreme Court shall be duly constituted for its work by not less than five Supreme Court Justices except as otherwise provided in article 133 of this Constitution.

(3) The Chief Justice shall preside at sittings of the Supreme Court and in his absence, the most senior of the Justices of the Supreme Court, as constituted, shall preside.

(4) A person shall not be qualified for appointment as a Justice of the Supreme Court unless he is of high moral character and proven integrity and is of not less than fifteen years' standing as a lawyer.

129.

(1) The Supreme Court shall be the final court of appeal and shall have such appellate and other jurisdiction as may be conferred on it by this Constitution or by any other law.

(2) The Supreme Court shall not be bound to follow the decisions of any other court.

(3) The Supreme Court may, while treating its own previous decisions as normally binding, depart from a previous decision when it appears to it right to do so; and all other courts shall be bound to follow the decisions of the Supreme Court on questions of law.

(4) For the purposes of hearing and determining a matter within its jurisdiction and the amendment, execution or the enforcement of a judgement or order made on any matter, and for the purposes of any other authority, expressly or by necessary implication given to the Supreme Court by this Constitution or any other law, the Supreme Court shall have

GHANA
CONSTITUTION

146.

(1) A Justice of the Superior Court or a Chairman of the Regional Tribunal shall not be removed from office except for stated misbehaviour or incompetence or on ground of inability to perform the functions of his office arising from infirmity of body or mind.

(2) A Justice of the Superior Court of Judicature or a Chairman of the Regional Tribunal may only be removed in accordance with the procedure specified in this article.

(3) If the President receives a petition for the removal of Justice of a Superior Court other than the Chief Justice or for the removal of the Chairman of a Regional Tribunal, he shall refer the petition to the Chief Justice, who shall determine whether there is a prima facie case.

(4) Where the Chief Justice decides that there is a prima facie case, he shall set up a committee consisting of three Justices of the Superior Courts or Chairmen of the Regional Tribunals or both, appointed by the Judicial council and two other persons who are not members of the Council of State, nor members of Parliament, nor lawyers, and who shall be appointed by the Chief Justice on the advice of the Council of State.

(5) The committee appointed under clause (4) of this article shall investigate the complaint and shall make its recommendations to the Chief Justice who shall forward it to the President.

(6) Where the petition is for the removal of the Chief Justice, the President shall, acting in consultation with the Council of State, appoint a committee consisting of two Justices of the Supreme Court, one of whom shall be appointed chairman by the President, and three other persons who are not members of the Council of State, nor members of Parliament, nor lawyers.

(7) The committee appointed under clause (6) of this article shall inquire into the petition and recommend to the President whether the Chief Justice ought to be removed from office.

(8) All proceedings under this article shall be held in camera, and the Justice or Chairman against whom the petition is made is entitled to be heard in his defence by himself or by a lawyer or other expert of his choice.

(9) The President shall, in each case, act in accordance with the recommendations of the committee.

**EXHIBIT 9**

(10) Where a petition has been referred to a committee under this article, the President may -

    (a) in the case of the Chief Justice, acting in accordance with the advice of the Council of State, by warrant signed by him, suspend the Chief Justice;

    (b) in the case of any other Justice of a Superior court or of a Chairman of a Regional Tribunal, acting in accordance with the advice of the Judicial Council, suspend that Justice or that Chairman of a Regional Tribunal.

(11) The President may, at any time, revoke a suspension under this article.

**147.**

(1) A panel member of a Regional Tribunal, other than the Chairman, shall have such allowances and benefits as may be determined by the President acting on the advice of the Judicial Council.

(2) A panel member of a Regional Tribunal other than the Chairman may be removed by the Chief Justice acting on the advice of the Judicial Council and of the Regional Co-ordinating Council on grounds of stated misbehaviour or incompetence or on ground of inability to perform his functions arising from infirmity of body or mind.

(3) For the purposes of clause (2) of this article the panel member concerned is entitled to be heard in his defence by himself or by a lawyer or other expert of his choice.

*Appointment, retirement and removal of Judicial Officers*

**148.**

Subject to the provisions of this article, the power to appoint persons to hold or to act in a judicial office shall be vested, subject to the approval of the President in the Chief Justice acting on the advice of the Judicial Council.

**149.**

Judicial officers shall received such salaries, allowances, facilities and privileges and other benefits as the President may, acting on the advice of the Judicial Council determine.

GHANA
CONSTITUTION

## CHAPTER TWENTY-SIX

## MISCELLANEOUS

293.

(1) Where a person has a claim against the Government, that claim may be enforced as of right by proceedings taken against the Government for that purpose without the grant of a fiat or the use of the process known as petition of right.

(2) The Government shall be subject to all those liabilities in tort to which, if it were a private person of full age and capacity, it would be subject -

    (a) in respect of torts committed by its employees or agents;

    (b) in respect of a breach of duties which a person owes to his employees or agents at common law or under any other law by reason of being their employer; and

    (c) in respect of a breach of the duties at common law or under any other law attached to the ownership, occupation, possession or control of property.

(3) No proceedings shall lie against the Government by virtue of paragraph (a) of clause (2) of this article in respect of an act or omission of an employee or agent of the Government unless the act or omission would, apart from this article, have given rise to a cause of action in tort against that employee or his estate.

(4) Where the Government is bound by a statutory duty which is binding also upon persons other than the Government and its officers, the Government shall, in respect of a failure to comply with that duty, be subject to all liabilities in tort to which it would be so subject if the Government were a private person of full age and capacity.

(5) Where functions are conferred or imposed on an officer of the Government as such officer either by a rule of the common law or by statute and that officer commits tort while performing or purporting to perform those functions, the liabilities of the Government in respect of the tort shall be what they would have been if the function had been conferred or imposed solely by virtue of instructions lawfully given by the Government.

(6) No proceedings shall lie against the Government by virtue of this article in respect of -

## EXHIBIT 10

(a) anything done or omitted to be done by any person while discharging or purporting to discharge responsibilities of a judicial nature vested in him; or

(b) any act, neglect or default of an officer of the Government unless that officer-

    (i) has been directly or indirectly appointed by the Government and was, at the material time, paid in respect of his duties as an officer of the Government wholly out of public funds or out of moneys provided by Parliament; or

    (ii) was, at the material time, holding an office in respect of which the Public Services Commission certifies that the holder of that office would normally be so paid.

(7) Where the Government is subject to a liability by virtue of this article, the law relating to indemnity and contribution shall be enforceable-

(a) against the Government by an employee of the Government who is acting in the proper execution of his duties in respect of the liability or by any other person in respect of the liability to which that person is subject; or

(b) by the Government against any person other than an employee of the Government, in respect of the liability to which it is so subject, as if the Government were a private person of full age and capacity.

294.

(1) For the purposes of enforcing any provision of this Constitution, a person is entitled to legal aid in connection with any proceedings relating to this Constitution if he has reasonable grounds for taking, defending, prosecuting or being a party to the proceedings.

(2) Subject to clause (1) of this article, Parliament shall, by or under an Act of Parliament, regulate the grant of legal aid.

(3) Without prejudice to clause (2) of this article, Parliament may, under that clause provide for the granting of legal aid in such matters other than those referred to in clause (1) of this article as may be prescribed by or under that Act.

**ACT 462**                               Local Government Act, 1993

(7) The emoluments of a presiding member shall be determined by the District Assembly and paid out of the Assembly's own resources.

**18. Meetings**

(I) A District Assembly shall meet at least three times in a year.

(2) Matters for decision by the Assembly shall be determined by the votes of the majority of the members present and voting.

(3) In the event of equality of votes the presiding member shall have a casting vote.

(4) The validity of the proceedings of a District Assembly shall not be affected by a vacancy among its members or by a defect in the appointment or qualification of a member.

(5) A District Assembly may summon a public officer in the district to attend any of its meetings to provide the information or assistance required by the Assembly.

(6) The Minister shall make model standing orders for the conduct and proceedings of the District Assemblies.

**19. Executive Committees**

(I) There shall be established an executive committee of a District Assembly which shall be responsible for the performance of the executive and administrative functions of the District Assembly.

(2) An executive committee shall consist of not more than one-third of the total number of the members of the Assembly elected by the members from among themselves.

(3) The presiding member of the Assembly shall not be a member of the executive committee.

**20. District Chief Executive**

(I) In accordance with article 243 of the Constitution, the District Chief Executive for each district shall be appointed by the President with the prior approval of not less than two-thirds majority of the members of the District Assembly present and voting at the meeting.

(2) The District Chief Executive shall be the chairman of the executive committee of the District Assembly.

(3) The District Chief Executive

*(a)* shall preside at meetings of the executive committee of the District Assembly and in the absence of the chairman a member of the executive committee elected by the members from among themselves shall preside;

*(b)* is responsible for the day-to-day performance of the executive and administrative functions of the Assembly;

*(c)* is responsible for the supervision of the departments of the Assembly; and

*(d)* is the chief representative of the Government in the district.

V - 3466

[Issue I]

**EXHIBIT 11**

Local Government Act, 1993                                    **ACT 462**

(4) The office of the District Chief Executive becomes vacant if

   *(a)* a vote of no confidence against the District Chief Executive is passed supported by the votes of not less than two-thirds of the total number of the members of the District Assembly, or

   *(b)* the District Chief Executive is removed from office by the President, or *(c)*

   the District Chief Executive resigns or dies.

(5) Subject to subsection (4), the term of office of a District Chief Executive shall be four years in accordance with clause (2) of article 246 of the Constitution.

(6) A person shall not hold office as a District Chief Executive for more than two terms in succession.

(7) The emoluments of a District Chief Executive shall be determined, in accordance with article 250 of the Constitution by Parliament and shall be charged on the Consolidated Fund.

## 21. Functions of the executive committee

(I) By virtue of article 251 of the Constitution, the executive committee of a District Assembly shall perform the executive and co-ordinating functions of the District Assembly.

(2) Without prejudice to subsection (I), an executive committee shall,

   *(a)* co-ordinate plans and programmes of the sub-committees and submit these as comprehensive plans of action to the District Assembly;

   *(b)* implement resolutions of the District Assembly;

   *(c)* oversee the administration of the district in collaboration with the office of the District Chief Executive;

   *(d)* recommend, where it considers necessary, in the case of departments outside the supervision of the Assembly which are in the district, to the appropriate government Ministry, Department or Agency the appointment and replacement on stated grounds of officers within the area of authority of the District Assembly;

   *(e)* develop and execute approved plans of the units, area and towns and sub metropolitan districts within the area of authority of the District Assembly;

   *(f)* recommend to the District Assembly

      (i) the economic, social, spatial and human settlement policies relating to the development of the district;

      (ii) the harmonisation of the development policies of the district with the national development policies;

      (iii) the integration and the co-ordination of the processes of planning, programming, budgeting and implementation;

      (iv) the initiation and implementation of development programmes and projects at the district level; and

      (v) the monitoring and evaluation of those policies, programmes and projects.

CONSTITUTION

(3) Subject to this Constitution, a District Assembly shall be the highest political authority in the district, and shall have deliberative, legislative and executive powers.

242.

A District Assembly shall consist of the following members -

(a) one person from each local government electoral area within the district elected by universal adult suffrage;

(b) the member or members of Parliament from the constituencies that fall within the area of authority of the District Assembly as members without the right to vote;

(c) the District Chief Executive of the district; and

(d) other members not being more than thirty percent of all the members of the District Assembly, appointed by the President in consultation with the traditional authorities and other interest groups in the district.

243.

(1) There shall be a District chief Executive for every district who shall be appointed by the President with the prior approval of not less than two-thirds majority of members of the Assembly present and voting at the meeting.

(2) The District Chief Executive shall -

(a) preside at meetings of the Executive Committee of the Assembly;

(b) be responsible for the day-to-day performance of the executive and administrative functions of the District Assembly; and

(c) be the chief representative of the Central Government in the district.

(3) The office of District Chief Executive shall become vacant if -

(a) a vote of no confidence, supported by the votes of not less than two-thirds of all the members of the District Assembly is passed against him; or

**EXHIBIT 12**

(b) he is removed from office by the President; or

(c) he resigns or dies.

244.

(1) The District Assembly shall have a Presiding Member who shall be elected by the Assembly from among its members.

(2) The Presiding Member shall be elected by at least tow-thirds majority of all the members of the Assembly.

(3) The Presiding Member shall-

(a) preside over the meetings of the Assembly;

(b) perform such other functions as may be prescribed by law.

(4) Subject to clause (5) of this article, the term of office of the Presiding Member shall be two years and he shall be eligible for re-election.

(5) The Presiding Member shall cease to hold office whenever the Assembly by a majority of at least two-thirds of all the members of the Assembly vote to remove him from office.

245.

Parliament shall, by law, prescribe the functions of District Assemblies which shall include -

(a) the formulation and execution of plans, programmes and strategies for the effective mobilization of the resources necessary for the overall development of the district;

(b) the levying and collection of taxes, rates, duties and fees.

246.

(1) Elections to the District Assemblies shall be held every four years except that such elections and elections to Parliament shall be held at least six months apart.

(2) Unless he resigns or dies or the earlier ceases to hold office under clause (3) of article 243 of this Constitution, the term of office of the District Chief Executive shall be four years; and a person shall not hold office as a District Chief Executive for more than two consecutive terms.

GHANA
CONSTITUTION

# CHAPTER TWENTY

## DECENTRALIZATION AND LOCAL GOVERNMENT

240.

(1) Ghana shall have a system of local government and administration which shall, as far as practicable, be decentralized.

(2) The system of decentralized local government shall have the following features-

(a) Parliament shall enact appropriate laws to ensure that functions, powers, responsibilities and resources are at all times transferred from the Central Government to local government units in a co-ordinated manner;

(b) Parliament shall by law provide for the taking of such measures as are necessary to enhance the capacity of local government authorities to plan, initiate, co-ordinate, manage and execute policies in respect of all matters affecting the people within their areas, with a view to ultimately achieving localization of those activities;

(c) there shall be established for each local government unit a sound financial base with adequate and reliable sources of revenue;

(d) as far as practicable, persons in the service of local government shall be subject to the effective control of local authorities;

(e) to ensure the accountability of local government authorities, people in particular local government areas shall, as far as practicable, be afforded the opportunity to participate effectively in their governance.

241.

(1) For the purposes of local government, Ghana shall be deemed to have been divided into the districts in existence immediately before the coming into force of this Constitution.

(2) Parliament may by law make provision for the redrawing of the boundaries of districts or for reconstituting the districts.

## EXHIBIT 13

(3) Subject to this Constitution, a District Assembly shall be the highest political authority in the district, and shall have deliberative, legislative and executive powers.

242.

A District Assembly shall consist of the following members -

(a) one person from each local government electoral area within the district elected by universal adult suffrage;

(b) the member or members of Parliament from the constituencies that fall within the area of authority of the District Assembly as members without the right to vote;

(c) the District Chief Executive of the district; and

(d) other members not being more than thirty percent of all the members of the District Assembly, appointed by the President in consultation with the traditional authorities and other interest groups in the district.

243.

(1) There shall be a District chief Executive for every district who shall be appointed by the President with the prior approval of not less than two-thirds majority of members of the Assembly present and voting at the meeting.

(2) The District Chief Executive shall -

(a) preside at meetings of the Executive Committee of the Assembly;

(b) be responsible for the day-to-day performance of the executive and administrative functions of the District Assembly; and

(c) be the chief representative of the Central Government in the district.

(3) The office of District Chief Executive shall become vacant if -

(a) a vote of no confidence, supported by the votes of not less than two-thirds of all the members of the District Assembly is passed against him; or

(b) he is removed from office by the President; or

(c) he resigns or dies.

244.

(1) The District Assembly shall have a Presiding Member who shall be elected by the Assembly from among its members.

(2) The Presiding Member shall be elected by at least tow-thirds majority of all the members of the Assembly.

(3) The Presiding Member shall-

(a) preside over the meetings of the Assembly;

(b) perform such other functions as may be prescribed by law.

(4) Subject to clause (5) of this article, the term of office of the Presiding Member shall be two years and he shall be eligible for re-election.

(5) The Presiding Member shall cease to hold office whenever the Assembly by a majority of at least two-thirds of all the members of the Assembly vote to remove him from office.

245.

Parliament shall, by law, prescribe the functions of District Assemblies which shall include -

(a) the formulation and execution of plans, programmes and strategies for the effective mobilization of the resources necessary for the overall development of the district;

(b) the levying and collection of taxes, rates, duties and fees.

246.

(1) Elections to the District Assemblies shall be held every four years except that such elections and elections to Parliament shall be held at least six months apart.

(2) Unless he resigns or dies or the earlier ceases to hold office under clause (3) of article 243 of this Constitution, the term of office of the District Chief Executive shall be four years; and a person shall not hold office as a District Chief Executive for more than two consecutive terms.

247.

Subject to this constitution, the qualifications for membership of a District Assembly, the procedures of a District Assembly and other local government units lower than a District Assembly that may be created, shall be provided for by law.

248.

(1) A candidate seeking election to a District Assembly or any lower local government unit shall present himself to the electorate as an individual, and shall not use any symbol associated with any political party.

(2) A political party shall not endorse, sponsor, offer a platform to or in anyway campaign for or against a candidate seeking election to a District Assembly or any lower local government unit.

249.

Subject to any procedure established by law, the mandate of a member of a District Assembly may be revoked by the electorate or the appointing body.

250.

(1) The emoluments of a District chief Executive of a District Assembly shall be determined by Parliament and shall be charged on the consolidated Fund.

(2) The emoluments of a Presiding Member of a District Assembly and other members of the Assembly shall be determined by the District Assembly and paid out of the Assembly's own resources.

251.

(1) There shall be established an Executive Committee of a District Assembly which shall be responsible for the performance of the executive and administrative functions of the District Assembly.

(2) The composition of the Executive Committee and the procedure for its deliberations shall be as provided for by law.

252.

(1) There shall be a fund to be known as the District Assemblies Common Fund.

(2) Subject to the provisions of this Constitution, Parliament shall annually make provision for the allocation of not less than five percent of the total revenues of Ghana to the District Assemblies for development; and the amount shall be paid into the District Assemblies Common Fund in quarterly installments.

(3) The moneys accruing to the district Assemblies in the Common Fund shall be distributed among all the District Assemblies on the basis of a formula approved by Parliament.

(4) There shall be appointed by the President with the approval of Parliament, a District Assemblies Common Fund Administrator.

(5) Parliament shall by law prescribe the functions and tenure of office of the Administrator in such a manner as will ensure the effective and equitable administration of the District Assemblies Common Fund.

(6) Nothing in this Chapter or any other law shall be taken to prohibit the State or other bodies from making grants-in-aid to any District Assembly.

253.

The Auditor-General shall audit the accounts of the District Assemblies annually and shall submit his reports on the audit to Parliament.

254.

Parliament shall enact laws and take steps necessary for further decentralization of the administrative functions and projects of the Central Government but shall not exercise any control over the District Assemblies that is incompatible with their decentralized status, or otherwise contrary to law.

255.

(1) There shall be established a Regional Co-ordinating Council in each region, which shall consist of -

(a) the Regional Minister and his deputy or deputies;

(b) the Presiding Member and the District Chief Executive from each district in the Region;

(c) two chiefs from the Regional House of chiefs; and

(d) the Regional Heads of the decentralized ministries in the region as members without the right to vote;

(2) The Regional Minister shall be the Chairman of the Regional Co-ordinating Council.

(3) Subject to this Chapter, the functions of a Regional Co-ordinating Council shall be as prescribed by Act of Parliament.

256.

(1) The President shall, with the prior approval of Parliament, appoint for each region, a Minister of State who shall -

(a) represent the President in the region; and

(b) be responsible for the co-ordination and direction of the administrative machinery in the region.

(2) The President may, in consultation with the Minister of State for a region and with the prior approval of Parliament, appoint for the regional Deputy Minister or Deputy Ministers to perform such functions as the President may determine.

GHANA
CONSTITUTION

(3) Subject to this Constitution, a District Assembly shall be the highest political authority in the district, and shall have deliberative, legislative and executive powers.

242.

A District Assembly shall consist of the following members -

(a) one person from each local government electoral area within the district elected by universal adult suffrage;

(b) the member or members of Parliament from the constituencies that fall within the area of authority of the District Assembly as members without the right to vote;

(c) the District Chief Executive of the district; and

(d) other members not being more than thirty percent of all the members of the District Assembly, appointed by the President in consultation with the traditional authorities and other interest groups in the district.

243.

(1) There shall be a District chief Executive for every district who shall be appointed by the President with the prior approval of not less than two-thirds majority of members of the Assembly present and voting at the meeting.

(2) The District Chief Executive shall -

(a) preside at meetings of the Executive Committee of the Assembly;

(b) be responsible for the day-to-day performance of the executive and administrative functions of the District Assembly; and

(c) be the chief representative of the Central Government in the district.

(3) The office of District Chief Executive shall become vacant if -

(a) a vote of no confidence, supported by the votes of not less than two-thirds of all the members of the District Assembly is passed against him; or

**EXHIBIT 14**

**Act 663**          Public Procurement Act, 2003

**Authority to dispose**

**83.** (1) The head of a procurement entity shall convene a Board of Survey comprising representatives of departments with unserviceable, obsolete or surplus stores, plant and equipment which shall report on the items and subject to a technical report on them, recommend the best method of disposal after the officer in charge has completed a Board of Survey form.

(2) The Board of Survey's recommendations shall be approved by the head of the procurement entity and the items shall be disposed of as approved.

(3) Where items become unserviceable for reasons other than fair wear and tear, such as through accident or expiry, a set procedure established by the Board for handling losses shall be followed before the items are boarded and disposed of.

**Disposal procedures**

**84.** Disposal of obsolete and surplus items shall be by

    (a) transfer to government departments or other public entities, with or without financial adjustment;

    (b) sale by public tender to the highest tenderer, subject to reserve price;

    (c) sale by public auction, subject to a reserve price; or

    (d) destruction, dumping, or burying as appropriate.

### PART IX—MISCELLANEOUS PROVISIONS

**Instructions and guidelines for disposal of unserviceable stores**

**85.** (1) The Minister shall make further regulations on the disposal of unserviceable stores and obsolete equipment.

(2) The Board shall issue detailed instructions and policy guidelines relating to the disposal of unserviceable stores and equipment.

**Code of conduct**

**86.** The Board shall compile and publish a code of conduct with the approval of the Minister which shall apply to every official of a procurement entity, the Board, members of Tender Review Boards, as well as suppliers, contractors and consultants.

**Modifications**

**87.** (1) Except in cases of extreme urgency, where there will be an aggregate increase in the original amount of the contract by more than 10 percent of the original price, a procurement entity shall inform the appropriate Tender Review Boards in the case of a contract subject to review by the Tender Review Board of any proposed extension, modification or variation order with reasons.

(2) In the case of contracts which are not originally subject to review by a Tender Review Board, any proposed modification of contract which will make the revised contract price exceed the procurement method threshold or the threshold of the procurement entity shall be cleared with the appropriate Tender Review Board.

**Request for information by the Board**

**88.** Every procurement entity shall provide the Board with such information as the Board may require in writing, regarding procurement engaged in by the procurement entity.

**Investigation by the Board**

**EXHIBIT 15**

**Act 663**          Public Procurement Act, 2003

89. (1) The Board may appoint a person to conduct an investigation into any matter related to the conduct of procurement proceedings by a procurement entity, or the conclusion or operation of a procurement contract if it considers that an investigation is necessary or desirable to prevent, or detect a contravention of this Act.

(2) An investigator may, subject to subsection (3),

    *(a)* at any time during normal office hours, without previous notice, enter the premises of the procurement entity tenderer, supplier, contractor, or consultant concerned with the procurement proceedings under investigation;

    *(b)* require an officer, employee or agent of the procurement entity or tenderer, supplier, contractor, or consultant to produce any books, records, accounts or documents;

    *(c)* search premises for any books, records, accounts or documents;

    *(d)* examine and make extracts from and copies of books, records, accounts or documents of the procurement entity, tenderer, supplier, contractor or consultant;

    *(e)* remove books, records, accounts or documents of the procurement entity, tenderer, supplier, contractor or consultant for as long as may be necessary to examine them or make extracts from or copies of them, but the investigator shall give a detailed receipt for the books, records, accounts or documents removed;

    *(f)* require an officer, employee or agent of the procurement entity or tenderer, supplier, or contractor or consultant,

        (i) to explain an entry in the books, records, accounts or documents;

        (ii) to provide the investigator with information concerning the management or activities of the procurement entity or tenderers as may be reasonably required.

(3) The powers of entry and search conferred by subsection (2)*(a)* and *(c)* of this section shall not be exercised except with the consent of the procurement entity or tenderer, supplier, contractor, or consultant concerned or of the person in charge of the premises unless there are reasonable grounds to believe that it is necessary to exercise those powers for the prevention, investigation or detection of an offence or to obtain evidence relating to an offence.

(4) Any person who, without just cause, hinders or obstructs an investigator in the exercise of a function under this section commits an offence and is liable on summary conviction to a fine not exceeding 500 penalty units or a term of imprisonment not exceeding two years or to both.

**Procedures on completion of investigation**

89. (1) An investigator shall

    *(a)* forward a copy of the investigation report to the Board; and

    *(b)* send a summary of the findings and recommendations to the procurement entity and to any tenderer, supplier, contractor or consultant whose conduct was the subject of the investigation.

**Act 663**                    Public Procurement Act, 2003

(2) The Board shall, if satisfied that there has been a contravention of this Act or any other law in relation to procurement proceedings or procurement contracts, take action to rectify the contravention which action shall include

(a) annulment of the procurement proceedings;

(b) cancellation of the procurement contract;

(c) ratification of anything done in relation to the proceedings; or

(d) a declaration consistent with any relevant provisions of this Act.

(3) The Board shall afford a person adequate opportunity to make representations in a matter, before taking any action in terms of subsection (2) which may adversely affect the rights or property of that person.

**Statutory audits**

**91.** (1) The Auditor-General shall conduct annual audits of the procurement activities of entities and shall furnish copies of reports on the audits to the Board upon request from the Board.

(2) The Auditor-General shall also carry out specific audits into the procurement activities of entities and compliance by contractors, suppliers and consultants with the procurement requirements in this Act and regulations made under this Act at the request of the Board.

(3) The statutory audit of procurement activities may be relied upon by the Board to institute measures to improve the procurement system.

**Offences relating to procurement**

**92.** (1) Any person who contravenes any provision of this Act commits an offence and where no penalty has been provided for the offence, the person is liable on summary conviction to a fine not exceeding 1000 penalty units or a term of imprisonment not exceeding five years or to both.

(2) The following shall also constitute offences under this Act:

(a) entering or attempting to enter into a collusive agreement, whether enforceable or not, with any other supplier or contractor where the prices quoted in their respective tenders, proposals or quotations are or would be higher than would have been the case has there not been collusion between the persons concerned;

(b) directly or indirectly influencing in any manner or attempting to influence in any manner the procurement process to obtain an unfair advantage in the award of a procurement contract;

(c) altering any procurement document with intent to influence the outcome of a tender proceeding and this includes but is not limited to

(i) forged arithmetical correction;

(ii) insertion of documents such as bid security or tax clearance certificate which were not submitted at bid opening; and

(d) request for clarification in a manner not permitted under this Act.

**Corrupt Practices**

**93.** (1) Entities and participants in a procurement process shall, in undertaking procurement activities, abide by the provisions of article 284 of the Constitution.

**Act 663**          Public Procurement Act, 2003

(2) An act amounts to a corrupt practice if so construed within the meaning of corruption as defined in the Criminal Code, 1960 (Act 29).

**Review of threshold levels**

**94.** The threshold levels specified in Schedule 3 shall be reviewed by the Board and presented by the Minister for the approval of Parliament.

**Public access to legal texts**

**95.** The Chief Executive of the Board shall ensure that administrative rulings and directives of general application under this Act are promptly made available to the public.

**International obligations**

**96.** Notwithstanding the extent of the application of this Act to procurement, procurement with international obligations arising from any grant or concessionary loan to the government shall be in accordance with the terms of the grant or loan.

**Regulations**

**97.** (1) The Minister, in consultation with the Board, may make regulations by legislative instrument to give effect to the purposes of this Act.

(2) In furtherance of subsection (1), the Minister may make regulations

    *(a)* on the preparation and submission of tenders;

    *(b)* to provide for the manner of publication of the notice of procurement contract awards;

    *(c)* on the margin of preference in the evaluation of tenders;

    *(d)* on the preparation and submission of applications to prequalify for a tender;

    *(e)* on procurement proceedings on the basis of nationality;

    *(f)* on the procurement process where one entity or a specially appointed agent is to procure items on behalf of another entity;

    *(g)* on the disposal of unserviceable stores and obsolete equipment;

    *(h)* to amend the schedules to this Act; and

    *(i)* on any other matter connected with public procurement.

(3) Notwithstanding anything to the contrary in any enactment, a person who contravenes any regulation made under this Act is liable on summary conviction to a fine not exceeding 1000 penalty units or imprisonment for a term not exceeding five years or to both.

**Interpretation**

**98.** In this Act unless the context otherwise requires,

    " Board" means the Public Procurement Board established under section 1 of this Act;

    "Catastrophic event" means a disaster of a national proportion;

    "central management agencies" means the Public Services Commission, Office of the President and Office of the Head of Civil Service;

    "CEO" means chief executive officer;

    "confirmer" in relation to security means a person who or a bank which confirms letters of credit or bills;

    "consultancy services" means services which are of an intellectual and advisory nature provided by firms or individuals using their professional skills to

**Act 663**                          Public Procurement Act, 2003

study, design and organise specific projects, advise clients, conduct training or transfer knowledge;

"consultant" means a person, natural or corporate, dealing in the provision of services including consultancy services;

"currency" includes monetary unit of account;

"entity" means procurement entity;

"a domestic supplier" means a citizen who is a supplier or a corporate body with a majority shareholding owned by citizens which is a supplier;

"goods" means objects of every kind and description including raw materials, products and equipment and objects in solid, liquid or gaseous form, and electricity, as well as services incidental to the supply of the goods if the value of those incidental services does not exceed that of the goods themselves;

"governance institutions" includes Regional Co-ordinating Councils, District Assemblies, Metropolitan and Municipal Assemblies;

"head of entity" means in relation to

      (i) the central management agencies and Ministries, the sector Minister;

      (ii) subvented agencies, the Director–General, Executive Director, Secretary or Chief Executive;

      (iii) the Regional Co-ordinating Councils, the Regional Minister;

      (iv) the District Assemblies, the District Chief Executive;

      (v) State Owned Enterprises, the sector Minister;

"key staff" means important professional staff but excludes support staff;

"Least Cost Selection (LCS)" means a competitive method where quality and cost are taken into account but the firm offering the least cost is considered;

"local content" means a product originating from Ghana;

"Minister" means the Minister responsible for Finance;

"national interest" means a condition where the nation attaches high value, returns, benefit and consideration to the matter in question;

"national security" means a condition where security takes priority over economic consideration and efficiency;

"one stop only" means in relation to the operating threshold the procurement entity seeks, concurrent approval for a contract award from one tender review board only.

"performance security" means a security guaranteeing the performance of a contract;

"procurement contract" means a contract between the procuring entity and a supplier, contractor or consultant resulting from procurement proceedings;

"procurement entity" means any entity conducting public procurement under this Act;

"procurement unit" means the person or unit in the procurement entity that is dedicated to providing technical procurement services for the tender committee;

**Act 663**        Public Procurement Act, 2003

"professional body" means a body comprising members of a profession which is registered under the Professional Bodies Registration Decree, 1973 (N.R.C.D. 143) or under any other enactment;

"public funds" include the Consolidated Fund, the Contingency Fund and such other public funds as may be established by Parliament;

"Quality Cost Based Selection (QCBS)" means a competitive method of combining quality and cost of services in the selection of a firm taking into consideration

(a) the relative weight to be given to quality and the cost to be determined in each case depending on the nature of the assignment,

(b) the total score to be obtained by weighing the quality and the cost score and adding them together, where the weight assigned to the quality and price is determined by the relative importance of quality in the assignment;

"security" means an amount to secure the fulfillment of any obligation of a contractor, supplier or consultant, which may take the form of a financial deposit, a surety bond, or an irrevocable letter of credit;

"selection procedure where price is not a factor" means selection which is made on technical quality only and where price is negotiated later;

"service" means the furnishing of labour, time, or effort not involving the delivery of a specific end product other than reports, which are merely incidental to the required performance; and includes consulting, professional and technical services but does not include employment agreements or collective bargaining agreements;

"subvented agency" means an agency set up by Government to provide public service and financed from public funds allocated by Parliament in the annual appropriation;

"supplier or contractor" means any potential party or the party to a procurement contract with the procuring entity;

"technical services" means services which are tendered and contracted on the basis of performance of a measurable physical output such as drilling, mapping, aerial photography, surveys, seismic investigations, maintenance of facilities or plant and similar operations;

"Tender Committee" means the body within an entity with responsibility for planning, processing, and generally taking procurement decisions and ensuring compliance with the public procurement law, among others;

"tenderer" means a person who puts in a bid in a procurement contract;

"tender security" means security provided to the procurement entity to secure the fulfillment of an obligation under this Act and includes arrangements such as bank guarantees, surety bonds, stand-by letters of credit, cheques on which a bank is primarily liable, cash deposits and bills of exchange;

"works" means work associated with the construction, reconstruction, demolition, repair or renovation of a building or structure or surface and includes site preparation, excavation, erection, assembly, installation of

**Act 663**                    Public Procurement Act, 2003

plant, fixing of equipment and laying out of materials, decoration and finishing, and any incidental activity under a procurement contract.

**Repeal and savings**

99. (1) The following enactments are hereby revoked or repealed as appropriate:

 (a) The District Tender Board Regulations, 1995 (L.I. 1606);

 (b) the Ghana National Procurement Agency Decree, 1976 (S.M.C.D. 55); and

 (c) the Ghana Supply Commission Law, 1990 (P.N.D.C.L. 245).

(2) Notwithstanding the revocation and repeal of the enactments stated in subsection (1), any contracts, orders, decisions or anything made or done by a body which, until the coming into force of this Act, was charged with the performance of any of the functions under this Act shall, be valid and continue to be in force as if it was made or done under this Act.

(3) Where in the view of the Board the continued validity of an act under subsection (2) is inconsistent with this Act, the Board may take the appropriate decision to rectify the inconsistency to the extent consistent with this Act.

(4) Notwithstanding the coming into force of this Act, Tender Boards, and Committees which immediately before the coming into force of this Act performed the functions of Award Authorities as envisaged under this Act shall continue in existence until they are reconstituted or otherwise replaced under this Act.

**Act 663**          Public Procurement Act, 2003

## Request for quotations

**42.** A procurement entity may engage in procurement by requesting quotations in accordance with section 43,

    *(a)* for readily available goods or technical services that are not specially produced or provided to the particular specifications of the procurement entity; and

    *(b)* for goods where there is an established market if the estimated value of the procurement contract is less than the amount in Schedule 3.

## Procedure for request for quotation

**43.** (1) The procurement entity shall request quotations from as many suppliers or contractors as practicable, but from at least three different sources.

(2) Each supplier or contractor from whom a quotation is requested shall be informed whether any elements, apart from the charges for the goods or services themselves, such as transportation and insurance charges, customs duties and taxes, are to be included in the price.

(3) Each supplier or contractor shall only give one price quotation and shall not change its quotation;

(4) No negotiations shall take place between the procurement entity and a supplier or contractor with respect to a quotation submitted by the supplier or contractor, prior to evaluation of bids.

### PART V—TENDERING PROCEDURES

*Sub-Part I—Invitation of Tenders and Applications to Prequalify*

## National competitive tendering

**44.** (1) In procurement proceedings in which the procurement entity decides that only domestic suppliers or contractors may submit tenders, the procurement entity shall employ national competitive tendering procedures.

(2) The procurement entity is not required to employ the procedures set out in sections 47 and 48 of this Act if the estimated contract amount is lower than the value threshold specified in Schedule 3.

(3) The procurement entity may stipulate in the tender documents that tenderers must quote only in the local currency and payments must be made wholly in the local currency.

## International competitive tendering

**45.** (1) International competitive tendering shall be used whenever open competitive tendering is used and effective competition cannot be obtained unless foreign firms are invited to tender.

(2) Open international tendering shall be in accordance with Part IV and Part V of this Act and the following shall also apply:

    *(a)* the invitation to tender and tender documents must be in English, subject to sections 34 and 52;

    *(b)* the invitation to tender shall be placed in a newspaper with adequate circulation to attract foreign competition as provided under section 47;

## EXHIBIT 16

**Act 663**          Public Procurement Act, 2003

> (c) at least six weeks shall be allowed for submission of tenders in order to allow sufficient time for the invitation to reach candidates and to enable them to prepare and submit the tenders as provided in section 53;
>
> (d) technical specifications shall, to the extent compatible with national requirements, be based on international standards or standards widely used in international trade and in particular shall conform to the provisions of sections 33 and 50(3);
>
> (e) tenderers are permitted to express their tenders, as well as any security documents to be presented by them, in freely convertible currency and stated in the tender documents, subject to section 50(3) and section 55(2)(c); and
>
> (f) general and special conditions of contract as stated in the tender documents.

**Other international procedures**

46. Part IV and Part V shall apply with such modification as may be necessary whenever effective competition cannot be obtained unless foreign firms are invited to participate in procedures apart from open competitive international tendering such as selective tendering or invitation for proposals.

**Procedures for inviting tenders or applications to prequalify**

47. (1) A procurement entity shall invite tenders or, where applicable, applications to prequalify by causing an invitation to tender or an invitation to prequalify, to be published in the Procurement Bulletin.

(2) The invitation to tender or invitation to prequalify shall also be published in at least two newspapers of wide national circulation.

(3) The invitation may also be published in a newspaper of wide international circulation, in a relevant trade publication or technical or professional journal of wide international circulation.

**Contents of invitation to tender and invitation to prequalify**

48. (1) The invitation to tender shall contain the following information:

> (a) the name and address of the procurement entity;
>
> (b) the nature, quantity and place of delivery of the goods to be supplied, the country of origin, the nature and location of the works to be effected or the nature of the technical services and the location where they are to be provided;
>
> (c) the desired or required time for the supply of the goods or for the completion of the works, or the timetable for the provision of the services;
>
> (d) the criteria and procedures to be used to evaluate the qualifications of suppliers or contractors, in conformity with section 23;
>
> (e) a declaration, which may not be subsequently altered that suppliers or contractors may participate in the procurement proceedings regardless of nationality, or a declaration that participation is limited on the basis of nationality under section 25;
>
> (f) the means of obtaining the invitation documents and the place from where they may be obtained;

**Act 663**                    Public Procurement Act, 2003

    (g) the price, if any, charged by the procurement entity for the invitation documents;

    (h) the currency and means of payment for the invitation documents;

    (i) the language in which the invitation documents are available;

    (j) the place and deadline for the submission of tenders;

    (k) the place, date and time for the opening of bids; and

    (l) any other information considered relevant.

(2) An invitation to prequalify shall contain the information referred to in subsection (1)(a) to (e), (g), (h) and, if the information required under those paragraphs is already known, contain the information required under subsection (1) (j), as well as the following information

    (a) the means to obtain the pre-qualification documents and the place from where they can be obtained;

    (b) the price charged by the procurement entity for the pre-qualification documents;

    (c) the currency and terms of payment for the pre-qualification documents;

    (d) the language in which the pre-qualification documents are available;

    (e) the place and deadline for the submission of applications to prequalify and the time allowed for the preparation of pre-qualification applications shall not be less than four weeks.

**Provision of tender documents**

**49.** (1) The procurement entity shall provide the tender documents to suppliers or contractors in accordance with the procedures and requirements specified in the invitation to tender.

(2) If pre-qualification proceedings have taken place, the procurement entity shall provide a set of tender documents to each supplier or contractor that has been prequalified and that pays the price charged for those documents.

(3) The price that the procurement entity may charge for the tender documents shall reflect the cost of printing them and providing them to suppliers or contractors.

**Contents of tender documents and use of standard tender documents**

**50.** (1) Procurement entities shall use the appropriate standard tender documents stipulated in Schedule 4 with such minimum changes acceptable to the Board.

(2) Changes shall be introduced only through tender or contract data sheets, or through special conditions of contract and not by introducing changes in the standard tender documents.

(3) The invitation documents shall include,

    (a) instructions for preparing tenders;

    (b) the criteria and procedures, in conformity with the provisions of section 22, for the evaluation of the qualifications of suppliers or contractors;

    (c) the requirements on additional documentary evidence or other information that is to be submitted by suppliers or contractors to demonstrate their qualifications;

**Act 663**                    Public Procurement Act, 2003

(d) the nature and required technical and quality characteristics, in relation to the goods, works or technical services to be procured under section 33 including, but not limited to,

    (i) technical specifications, plans, drawings and designs,

    (ii) the quantity of the goods;

    (iii) any incidental services to be performed;

    (iv) the location where the works is to be effected or the services are to be provided; and

    (v) the desired or required time, if any when the goods are to be delivered, the construction is to be effected or the services are to be provided;

(e) the criteria to be used by the procurement entity to determine the successful tender, including any margin of preference and any criteria other than price to be used under section 59(4)(b)(c) or (d) and the factors apart from price to be used to determine the lowest evaluated bid, shall, to the extent practicable, be expressed in monetary terms, or given a relative weight in the evaluation provisions in the tender documents;

(f) the terms and conditions of the procurement contract and the contract form to be signed by the parties;

(g) a statement that the characteristics of the goods, works or services, contractual terms and conditions or other requirements set out in the invitation documents are permitted, and a description of the manner in which alternative tenders are to be evaluated and compared;

(h) a description of the portion or portions for which tenders may be submitted where suppliers or contractors are permitted to submit tenders for only a portion of the goods, works or services to be procured;

(i) the manner in which the tender price is to be formulated and expressed, including a statement whether the price covers elements apart from the goods, works or services, such as applicable transportation and insurance charges, customs duties and taxes;

(j) the currency or currencies in which the tender price is to be formulated and expressed;

(k) the language in conformity with section 52, in which tenders are to be prepared;

(l) any requirements of

    (i) the procurement entity connected with the issue, nature, form, amount and other principal terms and conditions of tender security to be provided by suppliers or contractors submitting tenders; and

    (ii) security for the performance of the procurement contract to be provided by a supplier or contractor that enters into the procurement contract, including securities such as labour and materials bonds;

(m) a statement that a supplier or contractor can modify or withdraw its tender prior to the deadline for the submission of tenders without forfeiting its tender security;

(n) the manner, place and deadline for the submission of tenders;

**Act 663**                    Public Procurement Act, 2003

(o) the means by which suppliers or contractors may seek clarification of the invitation documents and a statement whether the procurement entity intends to convene a meeting of suppliers or contractors;

(p) the period of time during which tenders will be in effect;

(q) the place, date and time for the opening of tenders;

(r) the procedures to be followed for opening and examining tenders;

(s) the currency that will be used to evaluate and compare tenders under section 58 and either the exchange rate that will be used for the conversion of tenders into that currency or a statement that the rate published by a specified financial institution prevailing on a specified date will be used;

(t) references to this Act, the procurement regulations and other Acts and regulations relevant to the procurement proceedings, but the omission of the reference shall not constitute grounds for review under Part VII or give rise to liability on the part of the procurement entity;

(u) the name, functional title and address of one or more officers or employees of the procurement entity who are authorised to communicate directly with and to receive communications directly from a supplier or contractor in connection with the procurement proceedings, without the intervention of an intermediary;

(v) any commitments to be made by the supplier or contractor outside the procurement contract, such as commitments relating to countertrade or to the transfer of technology;

(w) a statement of the right to seek review of an unlawful act or decision of, or procedure followed by the procurement entity in relation to the procurement proceedings;

(x) if the procurement entity reserves the right to reject tenders, a statement to that effect;

(y) any formalities that will be required once a tender has been accepted, for a procurement contract to enter into force, including, where applicable, the execution of a written procurement contract and approval by the Government and the estimated period of time following the despatch of the notice of acceptance that will be required to obtain the approval; and

(z) any other requirements established by the procurement entity under this Act and Regulations relating to the preparation and submission of tenders and to other aspects of the procurement proceedings.

**Clarifications and modifications of tender documents**

**51.** (1) A supplier or contractor may request promptly clarification of the tender documents from the procurement entity.

(2) The procurement entity shall respond to a request by a supplier or contractor within a reasonable time before the deadline for the submission of tenders to enable the supplier or contractor make a timely submission of its tender and shall without disclosing the source of the request communicate the clarification to the suppliers or contractors provided with the invitation documents.

(3) The procurement entity may modify the invitation documents by issuing an addendum prior to the deadline for submission of tenders.

**Act 663**          Public Procurement Act, 2003

(4) The addendum shall be communicated promptly to the suppliers or contractors provided with the invitation documents by the procurement entity and shall be binding on those suppliers or contractors.

(5) The procurement entity may convene a meeting of suppliers and contractors to clarify and modify tender documents and shall prepare minutes of any previous meeting concerned with clarification of the invitation documents without identifying the sources of the requests.

(6) The minutes shall be given promptly to the suppliers and contractors provided with the invitation documents by the procurement entity to enable them take the minutes into account in the preparation of their tenders.

*Sub-Part II—Submission of Tenders*

**Language of tenders**

**52.** (1) Tenders shall be formulated and submitted in English.

(2) Supporting documents and printed literature furnished by the tenderer may be in another language if they are accompanied by an accurate translation of the relevant passages in English.

(3) Where there is a translation, the translation shall be used to interpret the tender.

**Submission of tenders**

**53.** (1) The procurement entity shall,

(a) fix the place for, and a specific date and time as the deadline for the submission of tenders; and

(b) allow tenderers at least six weeks to prepare their tenders for international competitive tendering.

(2) The time for preparation of tenders under national competitive tendering procedures shall not exceed four weeks.

(3) If a procurement entity issues clarification or modification documents or if a meeting of tenderers is held, the procurement entity shall prior to the expiry of the deadline for the submission of tenders extend the deadline to give the suppliers and contractors reasonable time to take the clarification or modification, or the minutes of the meeting into account in their tenders.

(4) The procurement entity may, prior to the expiry of deadline for the submission of tenders, extend the deadline.

(5) The procurement entity shall, at least ten days before the expiry of the deadline, give notice of an extension of the deadline by fax, e-mail or any other expedited written means of communication to each supplier or contractor to whom the procurement entity provided the tender documents or to any new prospective tenderers.

(6) A tender shall be in writing, signed and be submitted in a sealed envelope.

(7) A tender may alternatively be submitted in any other form specified in the tender documents that provides a record of the contents of the tender and a similar degree of authenticity, security and confidentiality.

(8) The procurement entity shall provide the tenderer with a receipt showing the date and time when its tender was received.

**Act 663**                    Public Procurement Act, 2003

(9) A tender received by the procurement entity after the deadline for the submission of tenders shall not be opened and shall be returned to the supplier or contractor which submitted it.

**Period of validity of tenders; modification and withdrawal of tenders**

**54.** (1) The period of validity for a tender shall be the period specified in the tender documents.

(2) A procurement entity may request suppliers or contractors to extend the period of validity for an additional specified period of time.

(3) A supplier or contractor may refuse the request without forfeiting its tender security and the effectiveness of its tender will terminate upon the expiry of the unextended period of effectiveness.

(4) A supplier or contractor that agrees to an extension of the period of effectiveness of its tenders shall extend or procure an extension of the period of tender securities provided by it or provide new tender securities to cover the extended period of effectiveness of its tender.

(5) A supplier or contractor whose tender security is not extended or that has not provided a new tender security is considered to have refused the request to extend the period of effectiveness of its tender.

(6) A supplier or contractor may modify or withdraw its tender prior to the deadline for the submission of tenders without forfeiting its tender security unless otherwise stipulated in the tender documents.

(7) The modification or notice of withdrawal is effective if it is received by the procurement entity before the deadline for the submission of tenders.

**Tender securities**

**55.** (1) The procurement entity shall specify the principal terms and conditions of the required tender security in the invitation documents.

(2) When the procurement entity requires suppliers or contractors submitting tenders to provide tender security,

   (a) the requirement shall apply to each supplier or contractor;

   (b) the invitation documents shall stipulate that the issuer and confirmer of the tender security are acceptable to the procurement entity;

   (c) notwithstanding paragraph *(b)*, a tender security shall not be rejected by the procurement entity on the grounds that the tender security was not issued by an issuer in the country, if the tender security and the issuer otherwise conform to requirements in the invitation documents;

   (d) a supplier or contractor may request the procurement entity to confirm the acceptability of a proposed issuer or a proposed confirmer of a tender security before submitting a tender and the procurement entity shall respond promptly to the request;

   (e) confirmation of the acceptability of a proposed issuer or of a proposed confirmer does not preclude the procurement entity from rejecting the tender security on the ground that the issuer or confirmer has become insolvent or is otherwise not creditworthy.

**Act 663**                     Public Procurement Act, 2003

(3) Any requirement on tender security that refers directly or indirectly to conduct by the supplier or contractor submitting the tender may only relate to

    *(a)* withdrawal or modification of the tender after the deadline for submission of tenders, or before the deadline if stipulated in the invitation documents;

    *(b)* failure to sign the procurement contract if required by the procurement entity to do so;

    *(c)* failure to provide a required security for the performance of the contract after the tender has been accepted or to comply with any other condition precedent to signing the procurement contract specified in the tender documents.

(4) The procurement entity shall not make a claim to the amount of the tender security and shall promptly return or procure the return of the tender security document after whichever of the following occurs first

    *(a)* the expiry of the tender security;

    *(b)* the entry into force of a procurement contract and the provision of security for the performance of the contract, if the security is required by the invitation documents;

    *(c)* the termination of the tendering proceedings without the entry into force of a procurement contract; or

    *(d)* the withdrawal of the tender prior to the deadline for the submission of tenders.

*Sub-Part III—Evaluation and Comparison of Tenders*

**Opening of tenders**

**56.** (1) Tenders shall be opened

    *(a)* at the time specified in the tender documents as the deadline for the submission of tenders or at the deadline specified in any extension of the deadline; and

    *(b)* at the place and in accordance with the procedures specified in the tender documents.

(2) The time for opening of the tenders shall be the same as the deadline for receipt of tenders or promptly after that deadline.

(3) A supplier or contractor who has submitted a tender or a representative of that supplier or contractor, shall be permitted by the procurement entity to be present at the opening of tenders.

(4) The name and address of each supplier or contractor whose tender is opened and the tender price shall be announced to those present at the opening of tenders and communicated on request to a supplier or contractor who has submitted a tender but is not present or represented at the opening of the tenders.

(5) The tender price shall be recorded immediately in the record of tendering proceedings.

**Examination of tenders**

**57.** (1) The procurement entity may ask a supplier or a contractor for clarification of its tender in order to assist in the examination, evaluation and comparison of tenders.

**Act 663**                    Public Procurement Act, 2003

(2) No change in a matter of substance in the tender, including changes in price and changes aimed at making an unresponsive tender responsive, shall be sought, offered or permitted.

(3) Notwithstanding subsection (2), the procurement entity shall correct purely arithmetical errors that are discovered during the examination of tenders.

(4) The procurement entity shall give prompt notice of the correction to the supplier or contractor that submitted the tender.

**Responsiveness of tenders**

**58.** (1) A procurement entity shall regard a tender as responsive if it conforms to the requirements set out in the tender invitation documents.

(2) The procurement entity may, however, regard a tender as responsive if it contains minor deviations that do not materially alter or depart from the characteristics, terms, conditions and other requirements set out in the invitation documents or if it contains errors or oversights that are capable of being corrected without touching on the substance of the tender.

(3) The deviations shall be quantified, to the extent possible, and shall be taken into account in the evaluation and comparison of tenders.

(4) A procurement entity shall not accept a tender

   (a) if the supplier or contractor that submitted the tender is not qualified;

   (b) if the tenderer that submitted the tender does not accept a correction of an arithmetical error made under subsection(1)(b);

   (c) if the tender is not responsive;

   (d) in the circumstances referred to in section 32 with respect to inducement from a tenderer.

**Evaluation of tenders**

**59.** (1) The procurement entity shall evaluate and compare the tenders that have been accepted in order to ascertain the successful tender in accordance with the procedures and criteria set out in the invitation documents.

(2) No criterion shall be used that has not been set out in the invitation documents.

(3) The successful tender shall be:

   (a) the tender with the lowest evaluated tender price; and

   (b) the lowest evaluated tender ascertained on the basis of criteria specified in the invitation documents which shall be

      (i) objective and quantifiable; and

      (ii) given relative weight in the evaluation procedure or expressed in monetary terms where practicable if the procurement entity has so stipulated in the invitation documents.

(4) To determine the lowest evaluated tender, the procurement entity shall consider

   (a) the tender price, subject to any margin of preference applied under section 60(2) ;

   (b) the cost of operating, maintaining and repairing the goods or works, the time for delivery of the goods, completion of works or provisions of the

**Act 663**           Public Procurement Act, 2003

services, the functional characteristics of the goods or works, the terms of payment and of guarantees in respect of the goods, works or services;

(c) the effect the acceptance of the tender will have on

(i) the balance of payments position and foreign exchange reserves of the country;

(ii) the countertrade arrangements offered by suppliers or contractors;

(iii) the extent of local content, including manufacturer, labour and materials, in goods, works or services being offered by suppliers or contractors;

(iv) the economic-development potential offered by tenders, including domestic investment or other business activity;

(v) the encouragement of employment, the reservation of certain production for domestic suppliers;

(vi) the transfer of technology;

(vii) the development of managerial, scientific and operational skills; and

(d) national security considerations.

**Margin of preference**

**60.** (1) A procurement entity may grant a margin of preference for the benefit of tenders for work by domestic contractors or for the benefit of tenders for domestically produced goods or for the benefit of domestic suppliers of services.

(2) The margin of preference shall be calculated in accordance with the procurement regulations and reflected in the record of the procurement proceedings;

(3) The margin of preference shall be authorised by the Board and be subject to approval by the Board.

**Multiple currency tender prices**

**61.** When tender prices are expressed in two or more currencies, the tender prices of the total number of tenders shall be converted to the same currency according to the rate specified in the invitation documents for the evaluation and comparison tenders.

**Repeat tender qualifications**

**62.** (1) The procurement entity may require the supplier or contractor which is the successful tenderer, to demonstrate its qualifications again, whether or not it has engaged in pre-qualification proceedings in accordance with criteria and procedures that conform to section 23 on prequalification proceedings.

(2) The criteria and procedures to be used for the further demonstration shall be set out in the tender documents.

(3) Where pre-qualification proceedings have been used, the criteria for further demonstration shall be the same as those used in the pre-qualification proceedings.

(4) If tenderers have not been pre-qualified, the entity shall determine whether the selected tenderer has the capacity to perform the contract effectively.

(5) The criteria to be met shall be specified in the tender documents and if the selected tender is rejected, the procurement entity shall make a similar determination of the next ranked best evaluated tender.

**Act 663**                    Public Procurement Act, 2003

(6) If the supplier or contractor submitting the successful tender is requested to demonstrate its qualifications again but fails to do so, the procurement entity shall reject that tender and shall select a successful tenderer, in accordance with section 59(4) from among the remaining tenders, subject to the right of the procurement entity to reject the remaining tenders.

**Non-disclosure of tender evaluation details**

63. Information relating to the examination, clarification, evaluation and comparison of tenders shall not be disclosed to suppliers or contractors or to any other person not involved officially in the examination, evaluation or comparison of tenders or in the decision on which tender should be accepted, except as provided in section 28 on the record of procurement proceedings.

**Prohibition of negotiations with suppliers or contractors**

64. (1) Subject to the exception in this section, no negotiations shall take place between the procurement entity and a supplier or contractor with respect to a tender submitted by the supplier or contractor.

(2) If the lowest evaluated responsive tender exceeds the budget for the contract by a substantial margin, the procurement entity shall investigate the causes for the excessive cost and may

(a) consider requesting new tenders; or

(b) subject to approval by the relevant Tender Review Board and guidelines issued by that Board, negotiate a contract with the lowest evaluated tenderer to try to obtain a satisfactory contract.

**Acceptance of tender and entry into force of procurement contract**

65. (1) A tender that has been ascertained to be the successful tender in accordance with this Act shall be accepted and notice of acceptance of the tender shall be given within 30 days of the acceptance of the tender to the supplier or contractor submitting the tender.

(2) Where the tender documents require the supplier or contractor whose tender has been accepted to sign a written procurement contract conforming to the tender, the procurement entity and the supplier or contractor shall sign the procurement contract within 30 days after the notice referred to in subsection (1) is despatched to the supplier or contractor.

(3) Where a written procurement contract is required to be signed, the contract shall enter into force on the commencement date indicated on the contract.

(4) Between the time when the notice is despatched to the supplier or contractor and the entry into force of the procurement contract, neither the procurement entity nor the supplier or contractor shall take any action that interferes with the entry into force of the procurement contract or with its performance.

(5) Except as provided in subsection (2), a procurement contract in accordance with the terms and conditions of the accepted tender enters into force when the notice is despatched to the supplier or contractor that submitted the tender, if it is despatched while the tender is in force.

**Act 663**         Public Procurement Act, 2003

(6) The notice is despatched when it is properly addressed or otherwise directed and transmitted to the supplier or contractor or conveyed to an appropriate authority for transmission to the supplier or contractor in a manner authorised in section 26.

(7) If the supplier or contractor whose tender has been accepted fails to sign a written procurement contract within 30 working days of receipt of the notice of acceptance or fails to provide the required security for the performance of the contract, the procurement entity shall select a successful tender in accordance with section 59(3) from among the remaining tenders that are in force, subject to the right of the procurement entity to reject the remaining tenders.

(8) The notice provided for in subsection (1) shall be given to the supplier or contractor that submitted the successful tender.

(9) A procurement entity shall give notice of the procurement contract in writing to unsuccessful suppliers and contractors and the notice shall

    *(a)* specify the name and address of the successful supplier or contractor who has entered into the contract and the contract price;

    *(b)* be given after the commencement of the procurement contract and may include the provision by the supplier or contractor of security for the performance of the contract;

    *(c)* for contracts above the threshold in Schedule 3, be published in the Procurement Bulletin which shall disclose the names of firms or individuals awarded contracts, the start and completion dates, as well as the value of the contracts.

### PART VI—METHODS AND PROCEDURES TO PROCURE CONSULTANTS

**Notice of invitation of expressions of interest and preparation of shortlists**

**66.** (1) A procurement entity shall invite consulting services by causing a notice seeking expression of interest in submitting a proposal to be published in the Public Procurement Bulletin for consultancy contracts above the threshold in Schedule 3.

(2) The notice shall,

    *(a)* contain the name and address of the procurement entity and a brief description of the services to be procured; and

    *(b)* be published in English and in a newspaper of wide circulation or in a relevant trade or professional publication of wide circulation except where participation is limited solely to national consultants under section 44 (1) or where the procurement entity decides that only national consultants may submit proposals.

(3) Where direct invitation is necessary for economic and efficiency reasons, the procurement entity with the approval of the Board may apply the provisions of subsection (1) and (2) where

    *(a)* the services to be procured are available only from a limited number of consultants, if it invites expressions of interest from all these consultants;

    *(b)* the time and cost required to examine and evaluate a large number of expressions of interest would be disproportionate to the value of the services to be performed, if it invites proposals from enough consultants to ensure effective competition; or

**Act 663**          Public Procurement Act, 2003

### *SCHEDULE 1*

### (Section 17)

### ENTITY TENDER COMMITTEES

1. <u>Tender Committee for Central Management Agency/ Ministry/Subvented Agency</u>

(1) **Chairperson**        A Minister, Chief Executive Officer or Head of Agency to be appointed by the President

(2) **Members**        *(a)* head of finance or head of accounts division;

*(b)* a representative of the Ministry of Justice not below Chief State Attorney;

*(c)* three other heads of division or department one of whom represents a user department or division.

*(d)* two members of Parliament from the region, one appointed by the Minister and the other chosen by the Regional Caucus of Members of Parliament.

(3) **Secretary**        The officer heading the procurement unit or department

(4) **Quorum**        The quorum of the Tender Committee shall be five members, including the chairperson and members shall not delegate their responsibility to any other person.

(5) **Voting**        Decisions shall be made by simple majority and the chairperson shall have a casting vote.

(6) **Functions**        The Committee shall

*(a)* review procurement plans in order to ensure that they support the objectives and operations of the entity;

*(b)* confirm the range of acceptable costs of items to be procured and match these with the available funds in the entity's approved budget,

*(c)* review the schedules of procurement and specifications and also ensure that the procurement procedures to be followed are in strict conformity with the provisions of this Act, its operating regulations and guidelines;

*(d)* ensure that the necessary concurrent approval is secured from the relevant Tender Review Board, in terms of the applicable threshold in Schedule 3 of this Act, prior to the award of the contract;

*(e)* facilitate contract administration and ensure compliance with all reporting requirements under this Act; and

<u>EXHIBIT 17</u>

**Act 663**                    Public Procurement Act, 2003

|  |  |
|---|---|
| | *(f)* ensure that stores and equipment are       disposed of in compliance with this Act. |

### 2. Tender Committee for Regional Co-ordinating Council

| | |
|---|---|
| **(1) Chairperson** | The Regional Minister |
| **(2) Members** | *(a)* the Director of Finance; and |
| | *(b)* a representative of the Ministry of Justice not below Senior State Attorney; |
| | *(c)* four heads of Departments, one of whom represents the user department/agency. |
| **(3) Member Secretary** | The Regional Co-ordinating Director |
| **(4) Quorum** | The quorum of the Tender Committee shall be four members, including the chairperson and members shall not delegate their responsibility to any other person |
| **(5) Voting** | Decisions shall be made by simple majority and the chairperson shall have a casting vote. |
| **(6) Functions** | The Committee shall |
| | *(a)* review procurement plans in order to ensure that they support the policies and programmes of the Regional Administration or District, Metropolitan or Municipal Assembly; |
| | *(b)* confirm the range of acceptable costs of items to be procured and match these with the available funds in the approved budget of the Regional Administration or District, Metropolitan or Municipal Assembly; |
| | *(c)* review the schedules of procurement and specifications and also ensure that the procurement procedures to be followed are in strict conformity with the provisions of this Act, its operating regulations and guidelines; |
| | *(d)* ensure that the necessary concurrent approval is secured from the relevant Tender Review Board, in terms of the applicable threshold in Schedule 3 of this Act, prior to the award of the contract; |
| | *(e)* facilitate contract administration and ensure compliance with all reporting requirements under this Act; and |
| | *(f)* ensure that stores and equipment are disposed of in compliance with this Act. |

### 3. Metropolitan/Municipal/District Tender Committee

| | |
|---|---|
| **(1) Chairperson** | the Metropolitan, Municipal or District Chief Executive |
| **(2) Members** | *(a)* the Director of Finance; |

**Act 663**                    Public Procurement Act, 2003

|  |  |
|---|---|
| | *(b)* a lawyer appointed by the Metropolitan, Municipal or District Assembly; |
| | *(c)* one Member of Parliament; and |
| | *(d)* three heads of Departments one of whom represents the user department or agency. |
| **(3) Member Secretary** | Co-ordinating Director |
| **(4) Quorum** | The quorum of the Tender Committee shall be four members, including the chairperson and members shall not delegate their responsibility to any other person. |
| **(5) Voting** | Decisions shall be made by simple majority and the chairperson shall have a casting vote. |
| **(6) Functions** | The Committee shall |
| | *(a)* review procurement plans in order to ensure that they support the policies and programmes of the Assembly; |
| | *(b)* confirm the range of acceptable costs of items to be procured and match these with the available funds in the approved budget of the Assembly; |
| | *(c)* review the schedules of procurement and specifications and also ensure that the procurement procedures to be followed are in strict conformity with the provisions of this Act, its operating regulations and guidelines; |
| | *(d)* ensure that the necessary approval is secured from the relevant Tender Review Board, in terms of the applicable threshold in Schedule 3 of this Act, prior to the award of the contract; |
| | *(e)* facilitate contract administration and ensure compliance with all reporting requirements under this Act; |
| | *(f)* ensure that stores and equipment are disposed of in compliance with this Act. |

**4. State Enterprises Tender Committee**

|  |  |
|---|---|
| **(1) Chairperson** | the sector Minister or Chairman of the Board |
| **(2) Members** | *(a)* the Chief Executive; |
| | *(b)* the Financial Controller; |
| | *(c)* the head of Technical Services; |
| | *(d)* representative of the Ministry of Justice not below Senior State Attorney; |
| | *(e)* two members of the Board; and |
| | *(f)* three heads of Departments appointed by the Minister. |

**Act 663**                    Public Procurement Act, 2003

| | | |
|---|---|---|
| (3) | **Secretary** | the head of procurement |
| (4) | **Quorum** | Five |
| (5) | **Voting** | Decisions shall be by simple majority and the chairperson shall have a casting vote. |
| (6) | **Functions** | The Committee shall |

    (a) review procurement plans in order to ensure that they support the objectives and operations of the Entity;

    (b) confirm the range of acceptable costs of items to be procured and match these with the available funds in the entity's approved budget;

    (c) review the schedules of procurement and specifications and also ensure that the procurement procedures to be followed are in strict conformity with the provisions of this Act, its operating regulations and guidelines;

    (d) ensure that the necessary concurrent approval is secured from the relevant Tender Review Board, in terms of the applicable threshold in Schedule 3 of this Act, prior to the award of the contract.

    (e) facilitate contract administration and ensure compliance with all reporting requirements under this Act; and

    (f) ensure that stores and equipment are disposed of in compliance with this Act.

**5. <u>Tertiary Institutions Tender Committee</u>**

| | | |
|---|---|---|
| (1) | **Chairperson** | Chairperson of Council |
| (2) | **Members** | (a) the Registrar; |

    (b) the Finance Officer;

    (c) a lawyer appointed by the Council;

    (d) one member nominated by the Development Committee;

    (e) one member appointed by the Ministry of Education;

    (f) one member appointed by the National Council on Tertiary Education (NCTE);

    (g) one representative of the students' Representative Council (SRC); and

    (h) one representative from an association of university teachers.

| | | |
|---|---|---|
| (3) | **Secretary** | the Senior Assistant Registrar with responsibility for the General Services schedule |
| (4) | **Quorum** | Five |

**Act 663**                    Public Procurement Act, 2003

(5) **Voting**                    Decisions shall be by simple majority and the chairperson shall have a casting vote.

(6) **Functions**                The Committee shall

(a) review procurement plans in order to ensure that they support the objectives and operations of the Institution, Faculty, Department or Entity;

(b) confirm the range of acceptable costs of items to be procured and match these with the available funds in the approved budget;

(c) review the schedules of procurement and specifications and also ensure that the procurement procedures to be followed are in strict conformity with the provisions of this Act, its operating regulations and guidelines;

(d) ensure that the necessary concurrent approval is secured from the relevant Tender Review Board, in terms of the applicable threshold in Schedule 3 of this Act, prior to the award of the contract;

(e) facilitate contract administration and ensure compliance with all reporting requirements under this Act; and

(f) ensure that stores and equipment are disposed of in compliance with this Act.

6. **College /School Tender Committee**

(1) **Chairperson**              Chairman of Board of Governors

(2) **Members**                  (a) Principal, Headmaster or Headmistress;

(b) the Bursar or Finance officer;

(c) two members of the governing board;

(d) a lawyer appointed by the governing board;

(e) two heads of department one being the beneficiary department.

(3) **Secretary**                Secretary to the governing board

(4) **Quorum**                   Five

(5) **Voting**                   Decisions shall be by simple majority and the chairperson shall have a casting vote.

(6) **Functions**                The Committee shall

(a) review procurement plans in order to ensure that they support the objectives and operations of the Institution or Entity;

(b) confirm the range of acceptable costs of items to be procured and match these with the available funds in the approved budget;

**Act 663**                    Public Procurement Act, 2003

(2) The annual report shall include a copy of the audited accounts together with the Auditor-General's report and the Minister shall as soon as practicable after receipt of the annual report submit the report to Parliament with such comment as the Minister considers necessary.

PART II—PROCUREMENT STRUCTURES

**Scope of application**

14. (1) This Act applies to

    (a) the procurement of goods, works and services, financed in whole or in part from public funds except where the Minister decides that it is in the national interest to use a different procedure;

    (b) functions that pertain to procurement of goods, works and services including the description of requirements and invitation of sources, preparation, selection and award of contract and the phases of contract administration;

    (c) the disposal of public stores and equipment; and

    (d) procurement with funds or loans taken or guaranteed by the State and foreign aid funds except where the applicable loan agreement, guarantee contract or foreign agreement provides the procedure for the use of the funds.

(2) Without limiting subsection (1), this Act applies to

    (a) central management agencies;

    (b) government ministries, departments and agencies;

    (c) subvented agencies;

    (d) governance institutions;

    (e) state owned enterprises to the extent that they utilise public funds;

    (f) public universities, public schools, colleges and hospitals;

    (g) the Bank of Ghana and financial institutions such as public trusts, pension funds, insurance companies and building societies which are wholly owned by the State or in which the State has majority interest;

    (h) institutions established by Government for the general welfare of the public or community.

(3) Where the Minister decides under subsection (1)(a) that it is in the national interest to use a different procedure, the Minister shall define and publish in the *Gazette* the method of procurement to be followed in order to serve the interest of economy.

**Procurement entity**

15. (1) A procurement entity is responsible for procurement, subject to this Act and to such other conditions as may be laid down in the procurement regulations and administrative instructions of the Minister, issued in consultation with the Board.

(2) The head of an entity and any officer to whom responsibility is delegated are responsible and accountable for action taken and for any instructions with regard to the implementation of this Act that may be issued by the Minister acting in consultation with the Board.

(3) Procurement decisions of an entity shall be taken in a corporate manner and any internal units concerned shall contribute to the decision making process.

**EXHIBIT 18**

GHANA
CONSTITUTION

(8) Where, in respect of a financial year, it is found that the amount of moneys appropriated by the Appropriation Act for any purpose is insufficient or that a need has arisen for expenditure for a purpose for which no sum of moneys has been appropriated by that Act, a supplementary estimate showing the sum of money required, shall be laid before Parliament for its approval.

(9) Where, in the case of a financial year, a supplementary estimate has been approved by Parliament in accordance with clause (8) of this article, a supplementary Appropriation Bill shall be introduced into Parliament in the financial year next following the financial year to which the estimates relates, providing for the appropriation of the sum so approved for the purposes specified in that estimate.

(10) Notwithstanding the provisions of the preceding clauses of this article, the President may cause to be prepared and laid before Parliament, estimates of revenue and expenditure of Ghana for periods of over one year.

(11) Whenever in the estimates prepared in accordance with clauses (1) and (8) of this article provision is made for an item or vote other than for the Contingency Fund, not relating to a specific item of expenditure, any moneys voted by Parliament in respect of that item or vote shall be under the control and supervision of a Committee which shall consist of the President, the Speaker and the Chairman of the Council of the Council of State.

180.

Where it appears to the President that the Appropriation Act in respect of any financial year will not come into operation by the beginning of that financial year, he may, with the prior approval of Parliament by a resolution, authorise the withdrawal of moneys from the Consolidated Fund for the purpose of meeting expenditure necessary to carry on the services of the Government in respect of the period expiring three months from the beginning of the financial year or on the coming into operation of the Act whichever is earlier.

181.

(1) Parliament may, be a resolution supported by the votes of a majority of all the members of Parliament, authorise the Government to enter into an agreement for the granting of a loan out of any public fund or public account.

**EXHIBIT 19**

(2) An agreement entered into under clause (1) of this article shall be laid before Parliament and shall not come into operation unless it is approved by a resolution of Parliament.

(3) No loan shall be raised by the Government on behalf of itself or any other public institution or authority otherwise than by or under the authority of an Act of Parliament.

(4) An Act of Parliament enacted in accordance with clause (3) of this article shall provide -

    (a) that the terms and conditions of a loan shall be laid before Parliament and shall not come into operation unless they have been approved by a resolution of Parliament; and

    (b) that any moneys received in respect of that loan shall be paid into the Consolidated Fund and form part of that Fund or into some other public fund of Ghana either existing or created for the purposes of the loan.

(5) This article shall, with the necessary modifications by Parliament, apply to an international business or economic transaction to which the Government is a party as it applies to a loan.

(6) For the purposes of this article, "loan" includes any moneys lent or given to or by the Government on condition of return or repayment, and any other form of borrowing or lending in respect of which -

    (a) moneys from the Consolidated Fund or any other public fund may be used for payment or repayment; or

    (b) moneys from any fund by whatever name called, established for the purposes of payment or repayment whether directly or indirectly, may be used for payment or repayment.

(7) The Minister responsible for finance shall, at such times as Parliament may determine, present to Parliament any information concerning any discrepancies relating to -

    (a) the granting of loans, their repayment and servicing;

    (b) the payment into the Consolidated Fund or other public fund of moneys derived from loans raised on institutions outside Ghana.

**Act 663**          Public Procurement Act, 2003

(2) A party to the negotiations shall not reveal to any other person any technical, price or other information relating to the negotiations without the consent of the other party.

PART VII—REVIEW

**Right to review**

78. (1) Any supplier, contractor or consultant that claims to have suffered, or that may suffer loss or injury due to a breach of a duty imposed on the procurement entity by this Act, may seek review in accordance with this Part.

(2) Notwithstanding subsection (1), the following shall not be subject to the review

    *(a)* the selection of a method of procurement under sections 35 to 43;

    *(b)* the choice of a selection procedure under section 75(6)*(a)*, 75(6)*(b)* or section 76;

    *(c)* the limitation of procurement proceedings in accordance with section 44; and

    *(d)* a decision by the procurement entity under section 29 to reject tenders, proposals, offers or quotation.

**Review by procurement entity**

79. (1) A complaint shall, in the first instance, be submitted in writing to the head of the procurement entity if the procurement contract has not already entered into force.

(2) The head of the procurement entity shall not entertain a complaint unless it was submitted within twenty days after the supplier, contractor or consultant submitting it became aware of the circumstances giving rise to the complaint or when that supplier, contractor, or consultant should have become aware of those circumstances, whichever is earlier.

(3) The head of the procurement entity may entertain a complaint or continue to entertain a complaint after the procurement contract has entered into force notwithstanding subsection (1).

(4) A procurement entity shall attempt to resolve a complaint by mutual agreement of the supplier or contractor and the procurement entity.

(5) The head of the procurement entity shall, within twenty-one days after the submission of the complaint, issue a written decision.

(6) The decision shall

    *(a)* state the reasons for the decision; and

    *(b)* if the complaint is upheld in whole or in part, indicate the corrective measures that are to be taken.

(7) If the head of the procurement entity does not issue a decision by the time specified in subsection (5), the supplier, contractor, or consultant, submitting the complaint is entitled to institute proceedings for administrative review under section 80.

(8) After the institution of the proceedings, the competence of the head of the procuring entity to entertain the complaint ceases.

**Administrative review**

80. (1) A supplier, contractor or consultant entitled to seek review may submit a complaint to the Board,

**EXHIBIT 20**

**Act 663**                        Public Procurement Act, 2003

    *(a)* within twenty-one days after

        (i) the supplier, contractor or consultant became aware of the circumstances giving rise to the complaint; or

        (ii) the time when the supplier, contractor or consultant ought to have become aware of those circumstances,

    if the complaint cannot be submitted under section 79 because of the entry into force of the procurement contract;

    *(b)* if the head of the procurement entity does not entertain the complaint because the procurement contract has entered into force, and the complaint is submitted within twenty-one days after the issuance of the decision not to entertain the complaint;

    *(c)* under section 79(7) if the complaint is submitted within twenty-one days after the expiry of the period referred to in section 79(5); or

    *(d)* if the supplier, contractor, or consultant claims to be adversely affected by a decision of the head of the procurement entity under section 79, and the complaint is submitted within twenty days after the issue of the decision.

    (2) Upon receipt of a complaint, the Board shall give notice of the complaint promptly to the procurement entity.

    (3) The Board may,

    *(a)* declare the legal rules or principles that govern the subject-matter of the complaint;

    *(b)* order that the provisions of this Act be complied with;

    *(c)* require the procurement entity that has acted or proceeded in an illegal manner, or that has reached an illegal decision, to act or to proceed in a legal manner or to reach a legal decision;

    *(d)* annul in whole or in part an illegal act or decision of the procurement entity, other than any act or decision bringing the procurement contract into force;

    *(e)* revise an illegal decision by the procurement entity or substitute its own decision for the decision, other than any decision bringing the procurement contract into force;

    *(f)* require the payment of compensation for reasonable costs incurred by the supplier or contractor who submitted the complaint, in connection with the procurement proceedings as a result of an illegal decision of, or procedure followed by the procurement entity;

    *(g)* order that the procurement proceedings be terminated;

    *(h)* dismiss the complaint and require the payment of compensation for reasonable costs incurred by the Procurement Entity or the Board.

    (4) The Board shall, within twenty-one days of starting a review, issue a written decision concerning the complaint, stating the reasons for the decision.

    (5) Correspondence pertaining to any complaint shall be copied to the Board.

**Certain rules applicable to review proceedings**

    **81.** (1) The head of the procurement entity or the Board shall notify the suppliers, contractors, or consultants participating in procurement proceedings about the submission

**Act 663**       Public Procurement Act, 2003

of a complaint and of its substance within 14 working days after the submission of the complaint for review.

(2) A supplier or contractor or any government authority whose interests are or could be affected by the review proceedings is entitled to participate in the review proceedings.

(3) A supplier, contractor, or consultant who fails to participate in the review proceedings is barred from subsequently making the same type of claim.

(4) A copy of the decision of the head of the procurement entity or of the Board shall be furnished within five days after the issue of the decision to the supplier, contractor, or consultant submitting the complaint to the procurement entity and to any other supplier, contractor or government authority that has participated in the review proceedings.

(5) After the decision has been taken, the complaint and the decision shall be promptly made available for inspection by the general public, but no information shall be disclosed if its disclosure would be contrary to law, would impede law enforcement, would not be in the public interest, would prejudice legitimate commercial interests of the parties or would inhibit fair competition.

**Suspension of procurement proceedings**

82. (1) Where review proceedings are initiated, the procurement proceedings may be suspended for 7 days if the complaint

    *(a)* is not frivolous;

    *(b)* contains a declaration which demonstrates that the supplier, contractor or consultant will suffer irreparable damage if the suspension is not granted; and

    *(d)* is likely to succeed

and the grant of the suspension will not cause disproportionate harm to the procurement entity or to other suppliers, contractors, or consultants.

(2) When the procurement contract enters into force, upon the submission of a complaint under section 79, performance of the procurement contract shall be suspended for seven days, if the complaint meets the requirements set out in subsection (1).

(3) The head of the procurement entity and the Board under subsection (2) may extend the suspension in order to preserve the rights of the supplier, contractor, or consultant who is a party to the review pending the disposition of the review proceedings, but the total period of suspension shall not exceed thirty days.

(4) The suspension provided for by this section shall not apply if the procurement entity certifies that urgent public interest considerations requires the procurement to proceed.

(5) The certification shall state the grounds for the finding that urgent considerations exist and shall be made a part of the record of the procurement proceedings, and it is conclusive with respect to administrative review.

(6) Any decision by the procurement entity under this section and the grounds and circumstances shall be made part of the record of the procurement proceedings.

**PART VIII—DISPOSAL OF STORES, PLANT AND EQUIPMENT**

# CHAPTER ONE

# THE CONSTITUTION

1.

(1) The Sovereignty of Ghana resides in the people of Ghana in whose name and for whose welfare the powers of government are to be exercised in the manner and within the limits laid down in this Constitution.

(2) The Constitution shall be the supreme law of Ghana and any other law found to be inconsistent with any provision of this Constitution should, to the extent of the inconsistency, be void.

2.

(1) A person who alleges that -

(a) an enactment or anything contained in or done under the authority of that or any other enactment; or

(b) any act or omission of any person;

is inconsistent with, or is in contravention of a provision of this Constitution, may bring an action in the Supreme Court for a declaration to that effect.

(2) The Supreme Court shall, for the purposes of a declaration under clause (1) of this article, make such orders and give such directions as it may consider appropriate for giving effect, or enabling effect to be given, to the declaration so made.

(3) Any person or group of persons of whom an order or direction is addressed under clause (2) of this article by the Supreme Court, shall duly obey and carry out the terms of the order or direction.

(4) Failure to obey or carry out the terms of an order or direction made or given under clause (2) of this article constitutes a high crime under this Constitution and shall, in the case of the President or the Vice-President, constitute a ground for removal from office under this Constitution.

**EXHIBIT 21**

# The Constitution

## CHAPTER TWO

## TERRITORIES OF GHANA

4.

(1) The sovereign State of Ghana is a unitary republic consisting of those territories comprised in the regions which immediately before the coming into force of this Constitution, existed in Ghana, including the territorial sea and the air space.

(2). parliament may by law provide for the delimitation of the territorial sea, the contiguous zone, the exclusive economic zone and the continental shelf of Ghana.

5.

(1) Subject to the provisions of this article, the President may, by constitutional instrument -

(a) create a new region;

(b) alter the boundaries of a region; or

(c) provide for the merger of two or more regions.

(2) If the President, upon a petition being presented to him and, on the advice of the Council of State, is satisfied that there is substantial demand for -

(a) the creation of a new region;

(b) the alteration of the boundaries of a region, whether or not the alteration involves the creation of a new region; or

(c) the merger of any two or more regions;

he shall, acting in accordance with the advice of the Council of State, appoint a commission of inquiry to inquire into the demand and to make recommendations on all the factors involved in the creation, alteration or merge.

(3) If, notwithstanding that a petition has not been presented to him, the President is, on the advice of the Council of State, satisfied that the need

**EXHIBIT 22**